W. Larry **HARLAN** and Mary Jane Harlan, Plaintiffs-Appellees,

v.

**UNITED STATES** of America, Defendant-Appellant.

No. 26383.

United States Court of Appeals Fifth Circuit.

April 4, 1969.

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Atty., Tax Div., Meyer Rothwacks, William A. Friedlander, Louis M. Kauder, Attys., Dept. of Justice, Washington, D. C., Eldon M. Mahon, U. S. Atty., Fort Worth, Tex., Martha Joe Stroud, Asst. U. S. Atty., Dallas, Tex., for defendant-appellant.

William D. Jordan, Vester T. Hughes, Jr., Larry L. Bean, Dallas, Tex. for appellees W. Larry and Mary Jane Harlan; Jackson, Walker, Winstead, Cantwell, & Miller, Dallas, Tex., of counsel.

Before AINSWORTH and SIMPSON, Circuit Judges, and MITCHELL, District Judge.

AINSWORTH, Circuit Judge:

In this taxpayer suit for refund of federal income taxes, the sole question for decision is whether certain funds advanced by shareholders to wholly owned insurance corporations at their inception, the funds being evidenced by so-called "surplus" notes, should be treated as indebtedness for tax purposes rather than contributions to capital, upon the ultimate payment of the notes. If the "surplus" notes constituted indebtedness, the payment thereof would be nontaxable to taxpayer; however, if they were in fact contributions to capital, payment thereof would be distributions and taxable under the provisions of the Internal Revenue Code of 1954 relating to dividends. See 26 U.S.C. §§ 301, 302 and 316.

The trial court rendered judgment in favor of taxpayers, husband and wife, allowing them refunds of federal income taxes in the sums of $10,434.01 and $10,420.20 plus interest, for the years 1963 and 1964. We find no error in the ruling of the court below, under the circumstances of this case, and therefore affirm. See Rule 52(a) of Federal Rules of Civil Procedure.

Appellees are referred to as "Taxpayer." They filed separate income tax returns for the years 1963 and 1964. The facts are not in dispute, having been stipulated.

On March 9, 1961, Taxpayer organized Union Bankers' Life Insurance Company ("Union") under the insurance laws of Arizona. Taxpayer paid the sum of $25,000 in exchange for all the capital stock. In compliance with Arizona law, which requires that such an insurance company maintain a surplus equal to half of the paid-in capital, Taxpayer advanced an additional sum of $12,500 to Union in return for which he was issued an interest-bearing "surplus" note of the corporation, payable on demand.[1]

1. The note referred to reads, in pertinent part, as follows:

"SURPLUS NOTE
$12,500.00             February 15, 1961
UNION BANKERS' LIFE INSURANCE COMPANY, a corporation

organized and existing under the laws of the State of Arizona,
hereby promises and agrees to pay to W. L. HARLAN, or order, on demand, the sum of TWELVE THOUSAND FIVE HUNDRED DOLLARS ($12,-

However, the note contains a clause that it shall mature and become payable only at such time or times as the surplus funds of said corporation exceed the sum of $12,500, and only to the extent that said surplus funds are in excess of $12,500.

On February 3, 1964, Taxpayer purchased all of the capital stock and a "surplus" note of a second insurance company, Anchor Life Insurance Company ("Anchor"), also organized under the insurance laws of Arizona. The Anchor note was identical in terms and amount to the Union note. The only difference between the Union transaction and the Anchor transaction is that the Union note was issued to Taxpayer at the inception of that corporation and the Anchor note was purchased by Taxpayer subsequent to incorporation. The parties, however, urge no legal distinctions in the treatment of the two transactions.

In compliance with Arizona law, under which the "surplus" notes do not constitute legal liabilities of the corporations, Taxpayer carried the funds as surplus on the balance sheets of the two corporations. Nevertheless, as authorized by Arizona law, Taxpayer showed the notes as indebtedness in his Annual Statements filed with the Arizona Insurance Department.[2]

Both enterprises succeeded. On April 8, 1963, Union repaid Taxpayer the sum of $12,500 represented by the "surplus" note, plus interest, and on October 14, 1964, Anchor did likewise.

In his tax returns for 1963 and 1964, respectively, Taxpayer reported the accrued interest as interest income. The remaining sum of $12,500 in each case was regarded as nontaxable repayment of indebtedness. The Commissioner of Internal Revenue assessed deficiencies based on his determination that the "surplus" notes of Anchor and Union represented contributions to capital, and that distributions to Taxpayer were equivalent to stock dividends and taxable as such. Taxpayer paid the deficiencies and filed this action for refund thereof.

The district court considered the following factors in holding that the "surplus" notes were debts: The form of the instruments (written notes) as well as the provision therein for reasonable interest (5 per cent) was indicative of debt. The court noted that surplus notes have been widely used and treated as debts in the

---

500.00) plus interest thereon at five per cent (5%) per annum from date until paid. This note shall mature and become payable only at such time or times as the surplus funds of said corporation exceed the sum of Twelve Thousand Five Hundred Dollars ($12,500.00), and only to the extent that said surplus funds are in excess of Twelve Thousand Five Hundred Dollars ($12,500.00), and upon demand for payment.

Any payment made shall first apply to the accrued interest, and the balance of said payment shall reduce the principal amount of this note.

IN WITNESS WHEREOF, the corporation has caused this note to be executed and its seal to be affixed by its proper officers duly authorized so to do."

2. The notes were issued in compliance with Section 20–725 of the Arizona Insurance Code:

"§ 20–725. Borrowed surplus

A. A domestic stock or mutual insurer may borrow money to defray the expenses of its organization, provide it with surplus funds, or for any purpose required by its business, upon a written agreement that such money is required to be repaid only out of the insurer's surplus in excess of that stipulated in such agreement. The agreement may provide for interest at the rate agreed upon but not exceeding six per cent per annum, which interest shall or shall not constitute a liability of the insurer as to its funds other than such excess of surplus, as stipulated in the agreement.

B. Money so borrowed, together with the interest thereon if so stipulated in the agreement, shall not form a part of the insurer's legal liabilities except as to its surplus in excess of the amount thereof stipulated in the agreement, or be the basis of any set-off, but until repaid, financial statements filed or published by the insurer shall show as a footnote thereto the amount thereof then unpaid together with any interest thereon accrued but unpaid.

* * *"

insurance industry. They were payable on demand and were actually paid two years (Union) and three years (Anchor) after the respective advances of funds. The fact that they were repayable only after surplus funds exceeded certain amounts was not considered to be controlling. There was adequate capitalization, the debt-equity ratio being one to two. The notes conferred no voting or managerial rights. They were freely transferable. Upon liquidation the noteholder's rights were superior to those of the company's shareholders. The court, after hearing the evidence, was convinced that the arrangement was at "arm's length," that the intent of the parties was to create a debt, and that Taxpayer's evidence of debt preponderated.

No one characteristic is decisive in determining what constitutes a debt, and decisions of the courts must be made on a case-by-case basis, being largely dependent upon their peculiar circumstances. See John Kelley Co. v. Commissioner of Internal Rev., 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278 (1946).[3]

■ One of the criteria for considering an advance by a shareholder to his corporation to be a loan is that the noteholder's rights are not subordinate to those of other creditors. Tomlinson v. 1661 Corporation, 5 Cir., 1967, 377 F.2d 291, 296; United States v. Henderson, 5 Cir., 1967, 375 F.2d 36, 40; United States v. Snyder Brothers Company, 5 Cir., 1966, 367 F.2d 980, 984; Montclair, Inc. v. C. I. R., 5 Cir., 1963, 318 F.2d 38, 40; Rowan v. United States, 5 Cir., 1955, 219 F.2d 51, 55; Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders (2 ed.), p. 123.[4] The

3. In Tomlinson v. 1661 Corporation, 5 Cir. 1967, 377 F.2d 291, 295, a case involving an issue similar to the one here, we said, "Because of the many variables involved in financing transactions such as the one presented here, it is clear that each case must be judged on its own unique fact situation." See also Montclair, Inc. v. C. I. R., 5 Cir., 1963, 318 F.2d 38, 40; United States v. Henderson, 5 Cir., 1967, 375 F.2d 36, 39.

4. There are many criteria for characterizing as indebtedness or equity an advance by a shareholder to his corporation, which are used in various combinations and interchangeably, dependent upon the circumstances of a given situation. Some of the more common factors which are set out in our opinion in Montclair, Inc. v. C. I. R., 5 Cir., 1963, 318 F.2d 38, 40, and repeated in Tomlinson v. 1661 Corporation, 5 Cir., 1967, 377 F.2d 291, 296, are:

"(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) 'thin' or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of 'dividend' money; (11) the ability of the corporation to obtain loans from outside lending institutions."

Tomlinson, 377 F.2d at 296, lists additional criteria: that initial payments, both capital and advances, were all made for acquisition of capital assets; or the issuance of certificates of stock; inordinately postponed due date; payment of advances as initial funds to start the corporate life.

Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders (2d ed.), p. 123, summarizes certain prerequisites for treatment either as debt or equity:

"A debt instrument ordinarily contains an unconditional obligation, to pay a principal sum certain, on or before a fixed maturity date not unreasonably far in the future, with interest payable in all events and not later than maturity. In addition, the obligation is ordinarily not subordinated in priority to general creditors, and does not entitle the holder to voting rights, except possibly on default. Conversely, the indicia that may require the instrument to be treated as equity (whether common stock, preferred stock, or a contribution to capital is often left unclear by the courts) are: an excessively far-off maturity date, or no maturity date; 'interest' contingent on earnings, or discretionary with corporate directors; subordination of interest or principal (or both) to the claims of general

Government contends that the district court erred in finding that "upon liquidation the noteholder's rights are superior to those of the company's shareholders (sic)." The Government reasons that "Because surplus is a component of net worth, which itself is simply the difference between assets and liabilities, a claim good only against earned surplus is subordinate to all liabilities since the surplus exists only to the extent that the corporate assets exceed all liabilities." However, the facts show that the notes were actually paid by both companies at a time when liabilities existed. Even if the notes were expressly subordinated to other indebtedness, this factor alone would not be determinative, Snyder Brothers, 367 F.2d at 983. Nor did a noteholder's subordination to creditors defeat a taxpayer's claim of debt in *Tomlinson*, 377 F.2d at 298.

The Government challenges the district court's consideration of Taxpayer's "intent" that the "surplus" notes be considered as genuine debts rather than capital contributions, as a criterion in reaching its decision. It points to the language of this court in United States v. Snyder Brothers Company, 5 Cir. 1966, 367 F.2d 980, 982–983, wherein we quoted with approval the following language from Kraft Foods Company v. Commissioner of Internal Rev., 2 Cir., 1956, 232 F.2d 118, 123:

"[W]e think the problem is not one of ascertaining 'intent,' since the parties have objectively manifested their intent. It is a problem of whether the intent and acts of these parties should be disregarded in characterizing the transaction for federal tax purposes."

A complete reading of the paragraphs relative to "intent" in both *Snyder*, 367 F.2d at 983, and in *Kraft*, 232 F.2d at 123, however, shows that intent was disregarded because the instruments involved contained no ambiguity on their face. In *Snyder*, we distinguished our holding in a prior case, stating, 367 F.2d at 983:

"This is not like the case of Rowan v. United States, 5 Cir., 219 F.2d 51, decided by this court, in which there were facts and circumstances that were ambiguous. There we said that the element of intent was necessary because in that case there were advances made that could, according to the intent of the parties, be either contributions to capital or loans to be repaid. In such a case, of course, the 'intent' of the parties could be controlling."

While we do not go so far as to say that intent is a controlling factor, nevertheless, because of the ambiguity of the instruments, payment of which is stated to be both on demand and contingent upon the corporation having surplus funds in excess of $12,500, we find that intent was properly considered by the district court, and find no error in the conclusion that the parties intended to create a genuine debt.[5]

---

creditors; voting rights or the right to participate in management; and restrictions on assignability."

5. The Government urges that the ultimate determination of whether an investment represents debt or contribution to capital is essentially one of law (citing United States v. Snyder Brothers Company, 5 Cir., 1966, 367 F.2d 980; United States v. Henderson, 5 Cir., 1967, 375 F.2d 36) and that the determination is made in accordance with the paramount policy of federal tax law. We find no fault with these generalities, however, inasmuch as there is no tax regulation as such pertaining to "surplus" notes, and we are obliged to weigh all of the pertinent factors in each case. In this regard we are also mindful of what the Supreme Court said in Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935):

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. [Citations omitted.] But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."

The Government strongly relies on Ambassador Apts., Inc. v. Commissioner of Internal Revenue, 2 Cir., 1968, 406 F.2d 288, which affirmed the Tax Court, holding, *inter alia*, that the transfer of an

Generally, an inordinately postponed due date or the absence of a fixed maturity date weighs in favor of characterizing an advance as a capital contribution.[6] Despite the fact that the payment of the notes was contingent upon surplus funds in excess of $12,500, the district court found that this provision did not convert the notes from debt to capital investment. This finding accords with reason in view of the fact that the Union and Anchor instruments (both denoted as "demand" instruments) were actually repaid two years and three years, respectively, after the advance of funds. Repayment in this relatively short time is an indication that an early maturity date was contemplated. In this respect the case differs from *Snyder Brothers*, *supra*, relied on by the Government, in which the debenture was payable in twenty years, and accords with *Rowan*, *supra*, in which a running open account manifested no "inordinately postponed due date." Id., at 55. Furthermore, the restriction on payment of surplus notes to a time when the surplus funds exceed a certain amount, is required by Arizona law, under which both companies were incorporated.

The Government also urges the identity of ownership existing between the stockholders and noteholders as an important factor indicative of equity in these transactions. While this factor is one to be considered along with all the other indicia, no significant importance has been placed on it by this court. Identity of ownership did not preclude a finding of indebtedness in *Tomlinson*, 377 F.2d at 297, and although it was one of the factors indicating equity as opposed to in-debtedness in *Snyder Brothers*, 367 F.2d 980, the court there indicated that this factor alone would not have been determinative. Id., at 983.

Finally the Government attempts to distinguish the present case from those cases which involve mutual insurers, e. g., Peter Theodore v. Commissioner, 38 T.C. 1011 (1962),[7] where the Tax Court held "surplus" notes to be valid debts. We have been unable to find a case involving surplus notes which were issued by stock insurance companies. However, the distinction is not material under the facts of this case. Although as indicated *Theodore*, supra, did concern a mutual insurance company, the facts in that case and the instant one are for all practical purposes indistinguishable, and we find it significant that the decision of the Tax Court in favor of Taxpayer in the *Theodore* case was reviewed and approved by the full Tax Court and acquiesced in by the Commissioner. 1966 —2 Cum.Bull. 7.

We find it unnecessary to comment upon the various cases from other circuits cited by the Government, which, like the cases from this circuit, are decided in the light of all the facts present.

With the exception of the contingency clause, the surplus notes have all the legal indicia of debt instruments. They are in written form, for a certain sum, with fixed interest payments, confer no voting rights, and contain no provision for subordination of holders to general creditors nor restriction against transferability. The reasonable interest provision of 5 per cent (less than the maximum 6 per cent authorized by Arizona law) also lends

apartment building to a controlled corporation in exchange for its stock and a note in the amount of $193,511 constituted a contribution to capital and that a specific finding of tax avoidance motivation was not a necessary element in making this determination. We note that in *Ambassador* the debt-to-equity ratio was 123 to 1, whereas the ratio here is 1 to 2.

6. Montclair, Inc. v. C. I. R., 5 Cir., 1963, 318 F.2d 38, 40; Tomlinson v. 1661 Corporation, 5 Cir., 1967, 377 F.2d 291,

296; Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders (2d ed.), p. 123.

7. See also C. I. R. v. Union Mutual Insurance Company of Providence, 1 Cir., 1967, 386 F.2d 974; Citizens Fund Mutual Fire Insurance Company, 28 T.C. 1017 (1957); Property Owners Mutual Insurance Co., 28 T.C. 1007 (1957); Holyoke Mutual Fire Insurance Co., 28 T.C. 112 (1957).

credence to the Taxpayer's intent to create a debt, as does the very low debt-to-capital ratio (one to two). Such a transaction, considering all the criteria pertinent thereto and comparing it to our analyses in prior cases before this court on the same issue, in our opinion lacks the aura of high-risk capital investments. We agree with the district court that the advance constituted indebtedness for the purpose of federal income taxation.

Affirmed.