ANTHONY MENNUTO AND STACIA MENNUTO, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2908–70—2910–70, 2924–70, 3000–70, 3001–70. Filed August 2, 1971.

---

[1] Cases of the following petitioners are consolidated herewith: Philip Russo and Concetta Russo, docket No. 2909–70; Martin J. Herman and Roslyn Herman, docket No. 2910–70; Charles W. Muscarelle and Antoinette Muscarelle, docket No. 2924–70; Irving Schornstein and Iris Schornstein, docket No. 3000–70; and Electro-Finish Corp., docket No. 3001–70.

*Alan M. Stark*, for the petitioners.
*Frank J. Smith*, for the respondent.

TANNENWALD, *Judge*: Respondent determined the following income tax deficiencies in these consolidated cases:

| Petitioners | Docket No. | Deficiency determined | |
|---|---|---|---|
| | | 1966 | 1967 |
| Anthony Mennuto and Stacia Mennuto | 2908-70 | $2,693.20 | $2,836.29 |
| Philip Russo and Concetta Russo | 2909-70 | 7,855.89 | |
| Martin J. Herman and Roslyn Herman | 2910-70 | 3,184.90 | 2,789.82 |
| Charles W. Muscarelle and Antoinette Muscarelle | 2924-70 | | 7,636.00 |
| Irving Schornstein and Iris Schornstein | 3000-70 | 2,516.24 | 2,483.39 |
| Electro-Finish Corp | 3001-70 | | 40,691.89 |

The issues remaining for decision are:

(1) Whether certain advances made to the corporate petitioner in the form of loans were in reality contributions to capital.

(2) Whether amounts claimed by the corporate petitioner as compensation paid to its shareholder-employees were excessive and unreasonable.

(3) Whether respondent has the right to recompute the corporate petitioner's investment credit carryover from a year for which assessment is barred by section 6501(a)[2] and section 6501(c)(4).

(4) Whether the petitioners in docket No. 3000-70 made charitable contributions in excess of the amounts allowed by respondent.

(5) Whether certain expenses incurred by the corporate petitioner should be capitalized or deducted from income in the year incurred.

### GENERAL FINDINGS OF FACT

Some of the facts have been stipulated and, along with the exhibits attached thereto, are incorporated herein by this reference.

---

[2] All statutory references herein are to the Internal Revenue Code of 1954, unless otherwise indicated.

Petitioners Anthony Mennuto (hereinafter referred to as Mennuto) and Stacia Mennuto are husband and wife who resided in Paramus, N.J., at the time their petition was filed herein. They filed joint Federal income tax returns for the calendar years 1966 and 1967 with the district director of internal revenue at Newark, N.J.

Petitioners Philip Russo (hereinafter referred to as Russo) and Concetta Russo are husband and wife who resided in Hohokus, N.J., at the time their petition was filed herein. They filed a joint Federal income tax return for the calendar year 1966 with the district director of internal revenue, Newark, N.J.

Petitioners Martin J. Herman (hereinafter referred to as Herman) and Rosyln Herman are husband and wife who resided in Emerson, N.J., at the time their petition was filed herein. They filed joint Federal income tax returns for the calendar years 1966 and 1967 with the district director of internal revenue at Newark, N.J.

Petitioners Charles W. Muscarelle (hereinafter referred to as Muscarelle) and Antoinette Muscarelle are husband and wife who resided in Saddle River, N.J., at the time their petition was filed herein. They filed a joint Federal income tax return for the taxable year ending July 31, 1967, with the district director of internal revenue at Newark, N.J.

Petitioners Irving Schornstein (hereinafter referred to as Schornstein) and Iris Schornstein are husband and wife who resided in Westfield, N.J., at the time their petition was filed herein. They filed joint Federal income tax returns for the calendar years 1966 and 1967 with the district director of internal revenue at Newark, N.J.

Electro-Finish Corp. (hereinafter referred to as EFC) is a New Jersey corporation whose principal place of business was located in Saddle Brook, N.J., at the time its petition was filed herein. EFC filed its corporate income tax returns for the taxable years ending March 31, 1966, and March 31, 1967, with the district director of internal revenue at Newark, N.J.

All of the petitioners except EFC utilized the cash disbursement and receipts methods of accounting on their returns for the years in question; EFC filed its returns on an accrual basis.

*Issue 1. Debt-Equity Issue*

FINDINGS OF FACT

For 14 years prior to 1963, Russo had been engaged in the business of manufacturing and selling aluminum storm windows and doors. From 1957 through 1963, he was president of Shield Products, Inc., a manufacturer of storm windows and doors.

A manufacturer of these products normally purchased strips of aluminum called extrusions and cut them in accordance with his particular needs. Russo was aware of a growing demand for painted extrusions, since metal thus treated offered a significantly greater resistance to atmospheric corrosion.

The process of applying paint electrostatically to aluminum extrusions starts by loading extrusions onto a conveyor for a wash cycle. After a degreasing spray, the extrusions are water-rinsed. Then, there is a spray application of Alodine solution, followed by another water rinse. The final pretreatment stage is a deoxylyte, acidulated rinse which provides extra corrosion resistance and adds adhesion power for subsequent painting. Residual moisture is evaporated in a dryoff oven before paint is applied. Then, automatically controlled spray guns apply an acrylic coating known as Duracron. After painting, the coating is solvent flashed-off and the extrusions are conveyed to an oven for a 7-minute bake at 440 degrees Fahrenheit. One conveyor carries the extrusions through the entire processing cycle. After baking, the extrusions are unloaded from the conveyor for packing. The entire production cycle takes approximately 1 hour and produces a paint coating on the extrusions that is exceptional as to hardness, adhesion, and finish.

In 1963, only two major companies were engaged in the manufacture of painted extrusions and both businesses were operating on a 24-hour basis in order to satisfy the growing demand for their product. Russo and his competitors were experiencing great difficulty in securing a steady supply of painted extrusions, and Russo felt that the business of producing painted extrusions had unlimited profit potential. In addition, Russo felt that, because longer extrusions would be more efficient and involve less waste after cutting by the window manufacturer, he could quickly capture a share of the market by producing 16-foot extrusions as opposed to the 8-foot extrusions produced by his two major competitors.[3]

In 1962 and 1963, Russo and Mennuto spent a great deal of time talking to salesmen and manufacturers in an effort to secure the technical knowledge necessary to order the appropriate equipment for painting extrusions.

On August 15, 1963, EFC was incorporated under the laws of the State of New Jersey for the purpose of painting aluminum extrusions.

At all relevant times, EFC had 500 shares of capital stock issued and outstanding. At the time of its incorporation, it had five equal shareholders, namely, Russo, Mennuto, Herman, Lewis Warner, and Lawrence Oxley, each of whom contributed $5,000 in cash in exchange

---

[3] Russo's optimism about the industry has been borne out by subsequent events; there are now 50 to 60 companies producing painted extrusions.

for 100 shares of stock. At the time of its incorporation and thereafter during all relevant times, Schornstein acted as its accountant and registered agent.

Shortly before November 4, 1963, Lewis Warner and Lawrence Oxley withdrew from EFC, and each surrendered his shares and received his $5,000 back. At or about the same time, Muscarelle and Schornstein replaced the withdrawing shareholders, and in turn, each received 100 shares of stock in exchange for a cash payment of $5,000. Schornstein allowed Martin Dinar, his partner in an accounting firm, to become a 50-percent partner in his shares. The agreement between Schornstein and Dinar was known to the other shareholders, but Schornstein remained the owner of record and only he actively participated in EFC's affairs.

At all relevant times on and after November 4, 1963, the five shareholders of record remained the same. Said shareholders were also the directors and officers of EFC at all relevant times and, as officers, held the following positions:

| | |
|---|---|
| Philip Russo | President |
| Charles W. Muscarelle | Vice president |
| Anthony Mennuto | Secretary |
| Martin J. Herman | Treasurer |
| Irving Schornstein | Assistant secretary |

Each active shareholder's background provided the corporation with some mechanical or managerial skill needed to get the enterprise under way. Russo was generally familiar with all phases of the intended operations; Mennuto was a tool and die maker familiar with all kinds of machinery and equipment; Herman was an industrial engineer; Muscarelle was an experienced builder; and Schornstein was a certified public accountant.

In November of 1963, EFC engaged Ramco Equipment Corp. (hereinafter referred to as Ramco) and Industrial Finishing Systems (hereinafter referred to as IFS) to install a turnkey production line. Ramco was to install all of the basic equipment including the conveyors and ovens, while IFS was to install paint booths and spray guns. The Ramco contract called for $50,000 in cash and $28,000 in notes, while the IFS contract called for $12,000 in cash and $28,000 in notes.

EFC also placed a security deposit of $5,000 with Midland Holding Co. pursuant to an agreement to lease a factory from Midland for $875 per month, starting February 17, 1964.

On November 4, 1963, the directors of EFC met and discussed the capitalization and cash requirements of the corporation. The directors anticipated that all equipment would be installed by February 15, 1964, and that it would take 6 weeks to shake out any "bugs" in the production

line before regular operations started. Russo and Schornstein presented a cash requirement and profit projection which showed that EFC could expect to produce a cash flow of $95,000 after taxes in its first 2 years of operation. Working capital requirements were estimated at $20,000. Against this background, the directors concluded that the $25,000 paid for the stock would be sufficient for the capital requirements of EFC, that an additional $75,000 would be needed to cover out-of-pocket costs prior to the intended April 1, 1964, starting date, and that the latter amount could easily be repaid out of the anticipated cash flow. They decided the EFC should borrow $15,000 from each active stockholder, at 6 percent per annum, with principal due in 5 years. Because of the cash flow projection, a prepayment clause without penalty was inserted in all notes. There were no restrictions on the transfer of the notes, nor were they at any time subordinated to the claims of creditors.

The adaptation of the factory and the installation of the equipment were completed on schedule and the testing and shakedown of the systems commenced on February 17, 1964. Basic problems in the production system were immediately encountered. The primary problem was the inability of the oven to maintain the required temperature. There were also some deficiencies in the material handling system and conveyor and unexpected difficulty in getting the necessary approval of the Labor Department of the State of New Jersey for the factory. Because of these difficulties, 15 months elapsed before normal production got underway in the spring of 1965. During this time, EFC was besieged with orders for its product and all indications pointed to a successful and profitable operation once the aforementioned temporary difficulties were overcome. The extended shakedown period coupled with additional costs for modification and replacement of faulty equipment necessitated further borrowing, which took the form of advances from the five shareholders to the corporation in equal shares on the following dates:

| Date | Amount |
|---|---|
| April 1964 | $25, 000 |
| July 1964 | 10, 000 |
| August 1964 | 10, 000 |
| December 1964 | 10, 000 |
| Total | 55, 000 |

EFC delivered notes for these amounts, which were identical to those issued on November 4, 1963, except for amount and due date. Similarly, their transfer was not restricted nor were they subordinated to the claims of other creditors. On each of the occasions that sums were advanced by the shareholders to the corporation, it was

anticipated that regular production would soon be under way and no further advances would be required.

On or about April 9, 1965, EFC also obtained a $75,000 loan from Fidelity Union Trust Company at 6-percent interest, payable in equal monthly installments over a period of 3 years.

The following extracts from EFC's tax returns reveal the following financial history:

|  | March 31, 1965 | March 31, 1966 | March 31 1967 |
| --- | --- | --- | --- |
| Sales | $206,671 | $529,787 | $876,458 |
| Other income | 139 | 550 | 1,066 |
| Cost of goods sold | (140,660) | (261,551) | (485,906) |
| Depreciation | (39,295) | (39,810) | (35,434) |
| All other debts | (67,838) | (181,824) | (231,916) |
| Total | (40,983) | [1] 47,152 | 124,208 |

[1] Before application of EFC's net operating loss carryover from fiscal year 1965.

EFC repaid the sums made available by the shareholders of record to EFC as follows:

| Date | Russo | Mennuto | Herman | Schornstein | Muscarelle |
| --- | --- | --- | --- | --- | --- |
| August, 1966 | $26,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| September, 1966 | | 3,000 | 3,000 | 3,000 | 3,000 |
| October, 1966 | | 5,000 | 5,000 | 5,000 | 5,000 |
| November, 1966 | | 5,000 | 5,000 | 5,000 | 5,000 |
| January, 1967 | | 3,000 | 3,000 | 3,000 | 3,000 |
| February, 1967 | | 3,000 | 3,000 | 3,000 | 3,000 |
| March, 1967 | | 5,000 | 5,000 | 5,000 | 5,000 |
| Total | 26,000 | 26,000 | 26,000 | 26,000 | 26,000 |

Payment of accrued interest on the loans was deferred through March 31, 1966, but was paid on June 1, 1966, and the interest from April 1, 1966, to the dates of repayment was paid in full with each repayment.

### OPINION

On the basis of the foregoing facts, we must determine whether any part of the advances made by EFC's shareholders to EFC, although in the form of loans, was, in reality, a contribution to capital. If the latter is the case, EFC would be denied a deduction for amounts paid as interest to the shareholders, and such interest and the repayments of the amounts advanced would be considered as dividend income to the shareholders to the extent of EFC's earnings and profits. Sec. 301(c) (1); sec. 316(a). The decided cases considering the question of whether a purported indebtedness is in fact a debt for tax purposes expound a myriad of tests and criteria; in the final analysis, however, the answer depends upon the particular facts and circumstances of each case, with the taxpayer bearing the burden of proof.

*Gooding Amusement Co.* v. *Commissioner*, 236 F. 2d 159, 165 (C.A. 6, 1956); *Green Bay Structural Steel, Inc.*, 53 T.C. 451, 456 (1969). For an exhaustive analysis of the various elements involved in resolving a debt-equity issue, see Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal," 26 Tax L. Rev. 369 (1971). We have considered the evidence in its entirety and have concluded that petitioners have satisfied that burden. We set forth only those particular facts which we deem minimally necessary to an understanding of our conclusion.

The advances made to EFC can be factually fragmentized into two separate sets of circumstances. The first set surrounds the $75,000 in advances made by EFC's five active shareholders in November of 1963. The notes, representing these advances, had a fixed maturity date and a fixed rate of interest. *John W. Walter, Inc.*, 23 T.C. 550 (1954). To be sure, the payment of interest was temporarily deferred, but that fact is not determinative. *Liflans Corporation* v. *United States*, 390 F. 2d 965, 969 (Ct. Cl. 1968); *Green Bay Structural Steel, Inc.*, 53 T.C. at 457; cf. *Charles E. Curry*, 43 T.C. 667, 691 (1965). The right to obtain repayment was in no way subordinated to the claims of other creditors. See *John Wanamaker Philadelphia* v. *Commissioner*, 139 F. 2d 644, 647 (C.A. 3, 1943); *Baker Commodities, Inc.*, 48 T.C. 374, 399 (1967), affirmed on another issue 415 F. 2d 519 (C.A. 9, 1969). The initial debt-equity ratio was 3 to 1. While a low ratio is not determinative (compare *Baker Commodities, Inc.*, 48 T.C. at 396), we conclude that the corporation was not undercapitalized. *Green Bay Structural Steel, Inc., supra; Ruspyn Corporation*, 18 T.C. 769 (1952).

The initial prospects of the business were bright, lending support to the conclusion that there was clearly a reasonable expectation of repayment. *Liflans Corporation* v. *United States*, 390 F. 2d at 970; *C.M. Gooch Lumber Sales Co.*, 49 T.C. 649, 656 (1968); *Malone & Hyde, Inc.*, 49 T.C. 575, 579 (1968). While the subsequent prompt repayment in full of the amounts advanced cannot serve to create an indebtedness which otherwise is found not to exist, such fact is strong supportive evidence that the transaction involved was what it purported to be. See *Harlan* v. *United States*, 409 F. 2d 904, 909 (C.A. 5, 1969); *Jack Daniel Distillery* v. *United States*, 379 F. 2d 569, 582 (Ct. Cl. 1967); *Baker Commodities, Inc.*, 48 T.C. at 397. Under these circumstances, the fact that *if* the business failed (an unlikely possibility), the equipment might have had to be sold as scrap is without significance.

We are likewise satisfied that the advances made in 1964 were also bona fide loans. Many of the same circumstances existing at the time of the 1963 advance were also present. In addition, the unexpectedly

long shakedown period, which necessitated additional financing, the ever increasing number of orders, which provided reasonable assurance of repayment to the shareholders, and the belief on each of the four occasions that the last needed advance had been made (which we find to be reasonable) persuade us that these transactions constituted bona fide loans, and not disguised contributions to capital.

The long and the short of it is that petitioners herein made normal business judgments in light of the situation that was expected to obtain. If we were to allow the respondent "to determine or rework the financial structure" of EFC under these circumstances (see *Green Bay Structural Steel, Inc.*, 53 T.C. at 457), we would be substituting our business judgment for that of petitioners. This we are not prepared to do. *Malone & Hyde, Inc., supra.*

## Issue 2. Compensation of Shareholder-Employees

### FINDINGS OF FACT

To the extent applicable, the findings of fact as to issue 1 are incorporated herein by reference.

Russo received a bachelor of science degree in mechanical engineering from Pratt Institute in 1946. In 1949, he began selling storm windows and doors and, in 1957, he formed his own company, Shield Products, Inc. (hereinafter referred to as Shield) for the purpose of manufacturing and selling the aforementioned products. In 1962 and 1963, Shield had about 15 to 20 employees and sales of $500,000 for each year. Russo was the president and sole shareholder of Shield. In 1962, Russo received $34,700, in 1963, he received $38,800, and in 1964 he received $45,600 from Shield, all as salary.

Russo was the individual most responsible for EFC's creation, development, and ultimate success in the painted extrusion industry. From 1964 through March 31, 1967, Russo devoted at least 60 hours a week to EFC's affairs. Russo was in charge of EFC's daily operations, and he spent most of his normal working hours at the factory in discharge of this duty. He also served as personnel manager and contract negotiator for the corporation. In fiscal years 1965 to 1967, inclusive, EFC paid Russo the following amounts as compensation for services rendered to EFC:

| Date | Amount |
| --- | --- |
| 1965 | $14,940 |
| 1966 | 27,276 |
| 1967 | 57,000 |

Russo's salary was determined by the board of directors at their monthly meetings. In the early years, Russo received a weekly salary

ranging from $100 to $400 per week, with bonuses. At a meeting held on May 17, 1965, Russo's compensation was fixed at "$400 per week plus a bonus arrangement of two mills per pound." At a meeting of the board of directors of EFC on May 16, 1966, his compensation was fixed at 1 cent per pound against a guarantee of $400 per week.

Schornstein received a bachelor of science degree in business administration from Rutgers University in 1948 and became a certified public accountant in 1953. In 1957, Schornstein formed a partnership with Martin Dinar for the purpose of practicing accounting, and that partnership continued throughout the years in question.

On his returns for the years 1963 to 1967, inclusive, Schornstein reported the following income from his accounting practice:

| Date | Amount |
| --- | --- |
| 1963 | $23, 774. 14 |
| 1964 | 16, 859. 62 |
| 1965 | 20, 239. 97 |
| 1966 | 16, 967. 95 |
| 1967 | 3, 641. 92 |

The drastic drop in Schornstein's income from his accounting partnership in 1967 was due to an agreement between Schornstein and his fellow shareholder in EFC and partner in the accounting practice, Martin Dinar, whereby Dinar took the greater part of income from the accounting practice in order to offset Schornstein's earnings from EFC.

When EFC's operations began in the early part of 1964, Schornstein performed services for it in the areas of bookkeeping, office management, and sales solicitation. In this latter capacity, he was required to take occasional trips to certain customers, but most of his work was done by telephone and mail. He devoted approximately 20 hours per week to this work.

After this initial period, Schornstein's accounting firm did most of the bookkeeping and auditing for EFC and billed the corporation directly for these services. Schornstein continued to render limited services to the corporation.

Prior to EFC's 1967 fiscal year, Schornstein received no payments of compensation for services. At a meeting of the board of directors held on April 25, 1966, his salary was fixed at $300 per week. For its fiscal year ending March 31, 1967, EFC paid Schornstein $24,580 for services rendered to EFC. This amount included a $10,000 bonus awarded to Schornstein by the board of directors of EFC on March 13, 1967.

Mennuto's education included 3 years of mechanical engineering at Fairleigh Dickinson University and 2 years of tool engineering at Stevens Institute of Technology. Prior to 1964, Mennuto had various

jobs as a diemaker, draftsman, and machinist. In 1964, Mennuto and a partner formed Dynamic Tool Corp. (hereinafter referred to as Dynamic) for the purpose of building special machinery, tools, and dies. Some of Dynamic's products were used by manufacturers of storm windows and doors, including Shield. During the years 1963 to 1967, inclusive, Mennuto received the following amounts from Dynamic as salary in his capacity as general manager of that corporation:

| Date | Amount |
|------|--------|
| 1963 | $24,920 |
| 1964 | 15,900 |
| 1965 | 20,900 |
| 1966 | 28,594 |
| 1967 | 35,000 |

When EFC began operations in February of 1964, Mennuto spent most of his time trying to iron out the numerous problems that cropped up in the production line. He also was involved in the design and construction of certain equipment which was built inside the factory itself. The performance of these services required most of Mennuto's time during the first 6 months of 1964, but after this initial period, Mennuto's presence was not needed except when a Saturday shift was working.

Prior to EFC's 1967 fiscal year, Mennuto received no payments of compensation for services. At the meeting of EFC's board of directors held on April 25, 1966, Mennuto's salary was fixed at $50 per week. At a board meeting held on July 26, 1966, it was increased to $100 per week. For its fiscal year ending March 31, 1967, EFC paid Mennuto $9,260 as compensation for services rendered to EFC during that year. This amount included a bonus of $5,000 awarded to Mennuto at the March 13, 1967, meeting of the board of directors of EFC.

Herman received a bachelor of science degree in mechanical engineering from CCNY in 1948. He also received credit for 20 hours of graduate engineering work at Columbia University and is a licensed engineer in the State of New Jersey. Herman was actively engaged in engineering work until 1958, when he commenced working for various soft-goods businesses.

During the years in question, Herman was the director of manufacturing for Form Flex Foundations (hereinafter referred to as Form Flex) and was responsible for its production activities in several plants around the country.

For the years 1963 to 1966, inclusive, Herman reported the following salary income from Form Flex:

| Date | Amount |
|------|--------|
| 1963 | $21,000 |
| 1964 | 23,000 |
| 1965 | 24,000 |
| 1966 | 29,000 |

When EFC commenced operations in February of 1964, Herman reviewed calculations submitted by outside engineers and designed internal equipment. Herman continued to perform services in this area during EFC's fiscal year ending March 31, 1967. He devoted about 15 hours per week to this work.

Prior to EFC's 1967 fiscal year, Herman received no payments of compensation for services. At the meeting of EFC's board of directors held on April 25, 1966, Herman's salary was fixed at $150 per week. At a board meeting held on July 26, 1966, it was increased to $200 per week. For its fiscal year ending March 31, 1967, EFC paid Herman $14,120 as compensation for services rendered to EFC during that year. This amount included a $5,000 bonus awarded to Herman at the March 13, 1967, meeting of the board of directors.

All the aforementioned sums paid as compensation were in addition to $120 paid to each member of the board of directors for each meeting he attended after March 31, 1965, the board members having waived their rights to payment for meeting attended prior to that date.

In his notice of deficiency, respondent determined that $52,460 of the above total compensation paid by EFC during its 1967 fiscal year was unreasonable as follows:

|  | Claimed | Allowed | Disallowed |
|---|---|---|---|
| Russo | $57,000 | $30,000 | $27,000 |
| Schornstein | 24,580 | 10,000 | 14,580 |
| Herman | 14,120 | 7,500 | 6,620 |
| Mennuto | 9,260 | 5,000 | 4,260 |

The total amount paid to Russo and the amounts of salaries (but not the bonuses) paid to Schornstein, Herman, and Mennuto during EFC's fiscal year 1967 constituted reasonable compensation for services rendered to EFC.

### OPINION

As was the case with the debt-equity issue, the question of whether amounts paid to shareholder-employees of a closed corporation constitute reasonable compensation is one of fact, and the burden of proof is on the taxpayers. *Botany Mills* v. *United States*, 278 U.S. 282 (1929); *Ben Perlmutter*, 44 T.C. 382, 401 (1965), affd. 373 F. 2d 45 (C.A. 10, 1967). Because EFC was closely held, we have given special scrutiny to the relevant facts. *Darco Realty Corporation* v. *Commissioner*, 301 F. 2d 190 (C.A. 2, 1962), affirming a Memorandum Opinion of this Court; *Heil Beauty Supplies* v. *Commissioner*, 199 F. 2d 193 (C.A. 8, 1952), affirming a Memorandum Opinion of this Court.

We think the compensation paid to petitioner Russo was reasonable in light of the valuable services performed by him for EFC. It seems

clear that EFC's success was due primarily to his efforts and that he spent a considerable part of his time working on EFC's behalf. While his compensation in fiscal year 1967 was based on the corporation's production, we think this reasonable in light of Russo's importance to the operation, the close relationship between his services and EFC's output, and the fact that the applicable formula was established early in that year.

As to petitioners Mennuto, Schornstein, and Herman, we think that the record establishes that the amounts of salaries paid to them during EFC's fiscal year 1967 constituted reasonable compensation for services rendered and, hence, that such amounts are deductible. We are unable to reach the same conclusion with respect to the bonuses paid to these three individuals. EFC argues that the compensation paid to these three individuals, including the bonuses, was in part intended for services performed by them for EFC prior to April 25, 1966, the date on which the salaries were first authorized. Granted that they received no payments of compensation prior to that date, the fact is that neither the minutes of the April 25, 1966, meeting nor of the March 13, 1967, meeting of the board of directors make any mention of past services. The record shows that the minutes of EFC were generally fully reflective of business decisions, and, under these circumstances, one would have expected them to evidence the fact that the compensation was intended to cover past services if that had been the actual intention of the parties. Under all the circumstance revealed by the entire record herein and in light of our evaluation of the demeanor and testimony of the witnesses, we conclude that, to the extent of the yearend bonuses paid to Schornstein, Mennuto, and Herman, the corporate petitioner has failed to sustain its burden of proof.[4]

### Issue 3. Investment Credit Carryover Computation

#### FINDINGS OF FACT

EFC filed its corporate income tax return for its fiscal year ended March 31, 1966, on June 18, 1966, and claimed the benefit of an unused investment credit carryover. The time for assessing deficiencies against EFC for that year was extended by consent to December 31, 1969. No deficiency for fiscal year 1966 was assessed against EFC prior to December 31, 1969, but, in his notice of deficiency sent to EFC for

---

[4] In his deficiency notice, respondent disallowed only $4,260 of the total compensation paid to Mennuto. To the extent that this amount is less than the $5,000 bonus paid to Mennuto, the deduction of the excess will nevertheless stand, since respondent has made no claim for an increased disallowance.

fiscal year 1967, respondent recomputed and disallowed in part the investment credit carryover claimed by EFC in 1967.

Both parties agree that the statute of limitations has run for assessing a deficiency for 1966, and the only question for decision is whether the Commissioner can recompute the amount of an unused investment credit carryover from a barred year (1966) in order to determine the tax due for an open year (1967).

Respondent's position herein is in accordance with that which he has adopted in a published ruling (Rev. Rul. 69–543, 1969–2 C.B. 1). His position is supported by numerous cases in the area of net operating losses which establish the proposition that it is proper, in determining a deficiency for an open year, to recalculate the amount of a net operating loss carryover from a barred year. *State Farming Co.*, 40 T.C. 774 (1963) ; *W. M. Ritter Lumber Co.*, 30 B.T.A. 231 (1934) ; *Lord Forres*, 25 B.T.A. 154 (1932). See also *Phoenix Coal Co.* v. *Commissioner*, 231 F. 2d 420 (C.A. 2, 1956) ; *Commissioner* v. *Van Bergh*, 209 F. 2d 23 (C.A. 2, 1954) ; *Springfield Street Railway Co.* v. *United States*, 312 F. 2d 754 (Ct. Cl. 1963). The fact that a net operating loss carryover is applied to the calculation of income for the open year, whereas the investment credit carryover directly affects the calculation of the tax, does not enlarge petitioners' rights; the critical element is that the deficiency being determined is for a year on which the period of limitations has not run. Cf. *Tressler* v. *Commissioner*, 206 F. 2d 538 (C.A. 4, 1953) ; *Z. W. Koby*, 14 T.C. 1103, 1108–1111 (1950) ; *Lawrence W. Carpenter*, 10 T.C. 64 (1948). Respondent's right to recalculate EFC's unused investment credit carryover is sustained. The exact amount of such carryover will be determined under the Rule 50 computation in light of our disposition of the substantive issues involved in the fiscal 1966 return of the corporate petitioner.

## *Issue 4. Other Matters*

### FINDINGS OF FACT

On their returns for 1966 and 1967, petitioner Irving Schornstein and his wife claimed deductions for charitable contributions of $1,544 and $1,251, respectively. Included in these amounts were miscellaneous contributions of $300 and $350, respectively, of which respondent disallowed $283 and $318, respectively. Said petitioners made miscellaneous contributions of $50 in each of the taxable years in question in excess of the amounts allowed by respondent.

In June of 1965, EFC installed a leeching pit in order to provide a draining area for liquid wastes produced in the process of painting the extrusions. It had previously been dumping this waste into a creekbed, but the local water department ordered it to cease this practice until the factory could be connected to the local sewerline. The cost of this leeching pit was $275 and it was designed to be functional for about 1 year. On its return for the fiscal year ended March 31, 1966, EFC deducted the amount expended as current expense of repair and maintenance.

In July of 1966, EFC determined that the original 1½-inch piping used to supply the factory with water was too small to satisfy its needs and replaced it with 2-inch piping at a cost of $1,390.50. This amount was also deducted as a repair and maintenance expense on EFC's return for fiscal year 1967.

## OPINION

Our finding of fact disposes of the Schornsteins' claim for charitable contributions and no further elaboration is needed.

As to the leeching pit, the evidence showed that this pit was designed to last for about 1 year, after which EFC expected to be connected (and was connected) to the city sewer system. Section 1.167(a)–1(b), Income Tax Regs., provides that the useful life of an asset is the period during which the asset may be expected to be useful to the taxpayer in his trade or business. In view of the anticipated useful life of the asset in EFC's business (*Massey Motors, Inc.* v. *United States*, 364 U.S. 92 (1960)), its cost was properly deducted *in toto* in 1966.

On the other hand, the cost of replacing the inadequate piping is a capital expenditure which must be depreciated over the useful life of the asset acquired. In *Plainfield-Union Water Co.*, 39 T.C. 333, 338 (1962), we noted that the proper test for distinguishing a repair from a capital expenditure was "whether the expenditure materially enhances the value, use, life expectancy, strength, or *capacity as compared with the status of the asset prior to the condition necessitating the expenditure.*" (Emphasis added.) In the instant case, an inadequate facility was replaced with a more efficient item which increased the capacity of the asset materially. Under these circumstances, the cost of the new piping must be capitalized. *Fire Companies Bldg. Corporation* v. *Burnet*, 57 F. 2d 943 (C.A.D.C. 1932).

To reflect our own findings and the concessions of the parties,

*Decisions will be entered under Rule 50.*