Alexander W. JONES and Margaret M. Jones, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

Howard E. CAMPBELL and Betty Campbell, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 80–7853, 80–7854.

United States Court of Appeals, Fifth Circuit.* Unit B

Oct. 19, 1981.

---

12. Thereafter, of course, the certification will remain in effect but subject to rebuttal or good faith doubt.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Pritchard, McCall & Jones, W. S. Pritchard, Jr., Birmingham, Ala., for plaintiffs-appellants.

J. R. Brooks, U. S. Atty., Birmingham, Ala., Karl L. Kellar, Atty., David Pincus, M. Carr Ferguson, Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, Tax Div.,

Dept. of Justice, Washington, D. C., for defendant-appellee.

Before HILL, FAY and HENDERSON, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Taxpayers[1] instituted these actions[2] in 1979 in the United States District Court, Northern District of Alabama, seeking refunds of federal taxes paid for years 1972–1974.[3] The district court, sitting without a jury, ruled in favor of the United States thereby denying taxpayers the refund they sought. We reverse.

## I.

This case presents a recurring issue in the corporate tax area, the classification of a transaction between a corporation and its majority shareholders as debt or equity. In this case, however, the involvement of a statutorily regulated insurance company distinguishes it from the vast number of debt-equity cases that have reached our Court. Those facts, to our good fortune, are not in dispute.

In 1954, taxpayers and others organized an Alabama insurance corporation, presently known as Associated Doctors Health and Life Insurance Company [hereinafter "Associated Doctors" or "corporation"]. The corporation did not fare well in the 1950s, and underwent some significant reorganization in 1961. At that time the corporation redeemed the shares of certain dissatisfied holders leaving taxpayers owning 90 percent of corporate stock, approximately 45 percent each.

---

1. Margaret M. Jones and Betty Campbell are parties to this case by virtue of having filed joint tax returns with their husbands. Textual use of the term "taxpayers" applies to Alexander W. Jones and Howard E. Campbell.

2. Separate complaints were filed by the Joneses and Campbells on April 27, 1979. Because of common questions of law and fact, the two cases were consolidated for trial as they were on appeal.

3. The amounts at issue as to the Joneses are $56,358.28 (1972), $40,083.40 (1973), and $29,272.73 (1974). The Campbells seek refunds in the following amounts: $43,546.99 (1972), $28,827.53 (1973), and $22,943.07 (1974).

The corporation soon began a massive effort to increase its business. A major stumbling block, however, lay in the very nature of state statutory requirements governing insurance companies. Typically, the states in which Associated Doctors wrote insurance required insurers to maintain high levels of cash capital and surplus so that the insurers' "creditors," the policyholders, would be adequately protected.[4] Moreover, in arriving at account balances, insurers were required to use highly conservative "statutory accounting" methods rather than the often-used "Generally Accepted Accounting Principles" [GAAP].[5] To ensure its compliance with state law, then, the corporation had to keep a close watch on the capitalization levels in these accounts. It was particularly difficult to maintain these levels on conservative accounting methods while simultaneously expending large sums of money in the aggressive generation of new business. Because the statutory accounting method required "expensing" costs in the year expenses are incurred, every sale of an insurance policy worsened the corporation's economic picture for the year of sale. The more new business in a year, the less favorable the short-run economics under statutory accounting. Indeed, by late 1962 the capital surplus account was insufficient to meet the capitalization requirements of the various states in which Associated Doctors did business.

In an effort to inject capital into the deficient account, Associated Doctors, on the suggestion of an insurance commissioner in one of the states in which the corporation did business, executed "surplus capital notes."[6] These notes, already in wide use at that time, were approved by many states[7] as financing devices since they permitted lenders to hold the insurer liable on the notes only to the extent that the insurer's surplus exceeded a given amount.[8] For their part, insurers would set the "given amount" at the surplus capitalization level required by states in which they did business. The surplus account, thus, was not available to a lender, by the very terms of his surplus capital note, for satisfaction of the insurer's debt to him. Policyholders' interests were not infringed by this arrangement since the surplus account designed for their protection remained intact.

Under this scheme, taxpayers in December 1962 began advancing property and cash to Associated Doctors. Between 1962 and 1965, the advances totalled approximately $963,000.[9] Annual advances during the period were memorialized by "surplus capital notes" with identical terms; only principal amounts and due dates differed.[10]

4. At that time, Associated Doctors was authorized to do business and was doing business in Alabama, Arkansas, Georgia, Mississippi, Missouri, and South Carolina.

5. The differences between these methods is apparently significant in theory and in practice. Statutory accounting, for example, does not permit capitalization of expenses, even if the expenses relate to income to be earned in future years. The 1962 figures for Associated Doctors bring the numerical disparity between the methods in focus. The corporation had a total capital and surplus, under statutory accounting, in the vicinity of $342,000. Under GAAP, total capital and surplus exceeded $1 million.

6. It should be noted that issuance of equity securities was not practical under these circumstances. Because statutory requirements centered around the capital surplus account in particular, Associated Doctors sought to increase *that* account. Amounts received from the sale of securities could not be credited in full to the surplus account. Rather, only the excess of price realized per share over par value per share properly could be entered as capital surplus. The amounts paid per share of stock would thus have to exceed par value before the capital surplus account could absorb any benefit.

7. *E. g.*, Ark.Stat.Ann. § 66–4233.

8. The amount varies from state to state; in Arkansas in 1962 it was $250,000.

9. Broken down by years, the advances were: $172,441.09 (1962); $262,149.28 (1963); $228,519.32 (1964); and $300,000 (1965).

10. The verbatim terms of the note were:

(1). Payment shall be in any coin or currency of the United States of America which at the time of payment is legal tender for public and private debts. It is understood and agreed that the Corporation shall at all

To provide Associated Doctors with these advances, taxpayers borrowed $855,000 from Globe Life and Accident Insurance Company (hereinafter "Globe"), a concern that in 1961 had purchased a large portion of Associated Doctors' business. Globe assigned the short-term notes executed in its favor by taxpayers to the First National Bank and Trust Company of Oklahoma City (hereinafter "FNB"), which retained recourse against Globe. From 1964 through 1969 taxpayers paid FNB interest only on these notes. Beginning in 1967, however, taxpayers were receiving from Associated Doctors interest and principal payments on the surplus capital notes. By that point, the corporation's surplus had reached a level sufficient to withstand those payments.

In October 1969, all parties to all debts restructured their arrangements. Globe acquired through a reinsurance agreement 17 percent of Associated Doctors' insurance business. For this Globe agreed to pay 25 percent of the commissions received on the transferred policies, up to $855,000, the principal amount owed by taxpayers to FNB. Associated Doctors assigned this right to taxpayers, who reassigned to American Finance Company of Oklahoma (hereinafter AFC), a corporate relative of

FNB. With the Globe commission contract as security, AFC then paid FNB $855,000, thereby satisfying taxpayers' notes to Globe. Finally, AFC assigned the taxpayers' obligations to it, together with the Globe commission contract, back to FNB. Apparently, that reassignment was for collection purposes.

Globe did not make payments under the commission contract directly to Associated Doctors. Instead, the arrangement envisioned payments by Globe to AFC or its collection agent, FNB. Essentially, this scheme eliminated the taxpayers from receiving and disbursing the funds involved. Furthermore, it alerted the defendant, the United States of America, to potential tax revenue which it promptly assessed and collected from taxpayers.

Upon audit of Associated Doctors and taxpayers for the three calendar years here at issue, the Internal Revenue Service treated Globe's payments as dividend income from Associated Doctors to taxpayers. Taxpayers, however, were permitted a deduction for interest amounts paid by Globe to FNB. Having paid the contested amounts of tax liability, taxpayers sued without success for refund. In this Court, they meet with success.

times maintain a surplus of not less than Two Hundred Fifty Thousand ($250,000.00) Dollars, and shall make no payment of interest or principal on this Note which would reduce the surplus below $250,-000.00.

(2). Payment shall be at the principal office of the Corporation.

(3). The Corporation will pay to the owners hereof or their assign from the date hereof interest at the rate not to exceed ten (10%) percent per annum, in like coin or currency, at maturity, or sooner as hereinafter provided. Interest which may accrue on this note shall not be a general obligation of the corporation.

(4). Redemption:

(4)(a). Inasmuch as the value received for this note is to be accounted for by the Corporation as "contributed or capital" surplus and not as a general obligation of the Corporation, and inasmuch as the purpose of this borrowing by the Corporation is to provide the Corporation with sufficient capital and surplus to qualify it to

continue to do business as a life and health and accident insurance company in various states, the Corporation reserves the option to redeem in whole or in part this Note at any time the Board of Directors of the Corporation deem the redemption to be in the best interest of the Corporation.

(4)(c). The Corporation reserves the option to pay interest accrued on this Note, in whole or in part, at any time prior to its maturity, when such payment in the judgment of the Board of Directors of the Corporation is in the best interest of the Corporation.

(5). Subordination of Note:

(5)(a). In the event of the appointment of a receiver or liquidator, the discontinuance of business, bankruptcy, government seizure, liquidation or dissolution, any claim made by the owners of this Note or their assigns shall be subordinate to all other valid claims against the assets of the Corporation, except that of the common stockholders.

## II.

The narrow question is whether Globe's payments to FNB are properly regarded as repayment of Associated Doctors' debt to taxpayers and thus nontaxable, or as dividends taxable under the Internal Revenue Code.[11] As earlier indicated, the issue is somewhat atypical because of state regulation of insurance companies and the resulting unavailability of many capital formation options. We do recognize controlling authority on this question in *Harlan v. United States*, 409 F.2d 904 (5th Cir. 1969). We are further instructed by the plethora of debt-equity cases that have reached this Court in years past and in particular by the factors that weighed in those analyses.

Our cases identify eleven [12] flexible [13] factors relevant to the determination at hand, several of which are highly relevant to our inquiry. We review the relevant ones well aware that "[e]ach case turns on its own factors; differing circumstances may bring different factors to the fore." *Slappey Drive Ind. Park v. United States*, 561 F.2d 572, 581 (5th Cir. 1977).

1. *Name.*—The instrument here involved was labeled "surplus capital note," nomenclature common in the insurance business to refer to a debt executed in contemplation of applicable state surplus capitalization requirements.

2. *Maturity date.*—These notes were not paid on the maturity date, a fact which the government would find fatal to taxpayer's case. We do not.[14] These "capital surplus notes" contained certain express conditions to commencement of debt repayment, which conditions were mandated by state law. By its terms, the note envisioned "no payment of interest or principal . . . which would reduce the surplus below $250,-000.00." Without this provision, Associated Doctors simply could not have lawfully executed the note. Once the surplus account permitted interest and principal payments to begin, repayment of the loans by Associated Doctors to taxpayers began.

3. *Relationship of would be "creditors" to general creditors.*—Here again, the government argues that because liability to the taxpayers was subordinated to the debts owing other corporate creditors, the transaction involves equity, not debt. Again we look to the purpose of subordination, and find that it was superimposed on this transaction by state law which sought to protect the insurer's most reliant creditors, the policyholders. Given this fact, we cannot hold that subordination destroyed the debt aspects of this transaction. A similar argument was presented to and rejected by this Court in *Harlan, supra*, 409 F.2d at 908.

4. *Adequacy of capitalization.*—No contention is raised that this corporation was, in a nonsurplus sense, inadequately capitalized at any relevant point. *See Harlan, supra*, 409 F.2d at 908. The fact of adequate capitalization indicates strongly that Associated Doctors sought bona fide legal debt in order to expand its business.

5. *Identity of ownership and ability of corporation to obtain loans elsewhere.*—

11. The relevant dividend provisions are 26 U.S.C. §§ 301, 316 (1976).

12. They are: (1) name of the instrument memorializing the transaction; (2) definitiveness of maturity date; (3) source of payments; (4) right to enforce payment; (5) participation in management; (6) relationship of would be "creditors" to general creditors; (7) intent of the parties; (8) adequacy of capitalization; (9) identity of ownership; (10) source of interest payments; and (11) ability of corporation to obtain loans elsewhere. *Tomlinson v. The 1661 Corporation*, 377 F.2d 291, 296 n.9 & 10 (5th Cir. 1967).

13. *See Tomlinson v. The 1661 Corporation*, 377 F.2d 291, 296 n.9 (5th Cir. 1967) ("To this might be added other criteria . . . .").

14. We have on a prior occasion stated that surplus capital notes demand different treatment with respect to due or maturity dates. *Harlan v. United States*, 409 F.2d 904, 909 (5th Cir. 1969). While the "difference" might result in lenience, the fact that "restruction on payment of surplus notes to a time when the surplus funds exceed a certain amount . . . is required by [controlling] law" is entitled to considerable weight in determining whether the due date's flexibility was bona fide *vel non*.

Each taxpayer owned 45 percent of Associated Doctors. The government suggests from this that taxpayers were merely lending themselves money. This, though relevant, is inconclusive in our eyes since it is quite reasonable to assume, as taxpayers assert, that Associated Doctors was not able to obtain financing elsewhere. Outside lenders would require general obligation notes, which Associated Doctors could not execute. The arrangement actually employed placed taxpayers and their personal liabilities as a protective shield to Globe. Globe, more than likely, was not willing to lend directly to Associated Doctors on a surplus capital basis. Only taxpayers, then, would suffer through an arrangement that insulated the debtor's first quarter-million dollars of surplus capital. But it hardly followed that taxpayers' doing so, for lack of another alternative, rendered the transaction anything other than a loan.

6. *Other factors.*—As our analysis above suggests at several points, the critical factor in our view is that state regulations and laws are the reason the parties to this transaction structured it as they did. "No one characteristic is decisive in determining what constitutes a debt, and decisions of the courts must be made on a case-by-case basis, being largely dependent upon their peculiar circumstances." *Harlan,* 409 F.2d at 907 & n.3. Like *Harlan,* the peculiar circumstance here is the interposition of state law between the parties and the desired transactional form. A general obligation note was out of the question in this situation. Of course, state law cannot under these circumstances prescribe a transactional form binding upon a federal court

analyzing tax consequences to the parties. But the very fact that an insurer seeking to structure a debt transaction is severely limited in his options, as well as the extent to which the transaction here paralleled the required form, leads us to the decision we reach.

### III.

Our conclusion, to be explicit, is that these notes, perhaps "hybrid" [15] in a sense, represent a debt transaction. The payments, then, from Globe to FNB are not constructive dividends running from Associated Doctors to taxpayers and should not be taxed as such. Taxpayers are entitled to an appropriate refund for the tax years at issue.

REVERSED.[16]

---

15. We are gratified that the Internal Revenue Service has at last responded to the Congressional mandate of 26 U.S.C. § 385 (1976), enacted in 1969, which, in the words of distinguished commentators "authorizes the Treasury to blanket the [debt-equity classification] area with regulations." B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, ¶ 4.02 at 4–7 (4th ed. 1979). The regulations finally issued apply only to instruments issued after April 30, 1981. *See* 26 C.F.R. § 1.385–1(a) (1980). The regulations

thus do not relate to this case; we nonetheless welcome their belated appearance with hopes that they may contribute to some certainty in a difficult area.

16. Our reversal on the debt/equity issue obviates the need to consider additional arguments raised by taxpayers. In this regard we also note that taxpayers moved on July 20, 1981 to file a supplemental brief with this Court relating to newly discovered evidence. We carried that motion with the case and presently deny it.