Capitol Finance Company, Inc. v. Commissioner.
Capitol Finance Co. v. Commissioner
Docket No. 7168-70.
United States Tax Court
T.C. Memo 1972-206; 1972 Tax Ct. Memo LEXIS 52; 31 T.C.M. (CCH) 1021; T.C.M. (RIA) 72206; September 25, 1972
Towner Leeper, 700 American Bank of Commerce Bldg., El Paso, Tex., for the petitioner. Paul H. Waldman, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent asserted deficiencies in petitioner's income tax for the years 1967, 1968, and 1969 in the respective amounts of $14,880.00, $17,424.00, and $15,915.42. 1022 The sole issue is whether amounts paid by petitioner to an officer-stockholder were reasonable compensation for services rendered so as to be deductible under section 162(a)(1), Internal Revenue Code of 1954. Findings of Fact Some of the facts have been stipulated and are found *53 accordingly. Capitol Finance Company, Inc. (hereinafter referred to as petitioner) is a Texas corporation which had its principal place of business in El Paso, Texas, at the time of filing its petition herein. It filed income tax returns on the cash basis for the calendar years 1967, 1968, and 1969 with the district director of internal revenue, Austin, Texas. At all times pertinent, petitioner engaged in the business of making personal or "consumer finance" loans, almost all in amounts of $100 or less and with a term of six months or less. No collateral or credit insurance was required. Defaulted loans were not judicially enforced when petitioner's own efforts at collection proved unavailing. Petitioner's operations were subject to regulation by the Texas Consumer Credit Commission. During the taxable years in issue, petitioner operated two connected offices on the second floor of the same building. Each office operated under a separate name and maintained separate internal accounting records. One office did business as Capitol Finance Company (hereinafter Capitol) and the other as Commercial Finance Company (hereinafter Commercial). Jack L. Lehman (hereinafter Lehman), his *54 wife, Virginia Lehman, and their son, John Robert Lehman (Robert), were the only shareholders, directors, and officers of petitioner. Lehman owned 300 shares and was secretary-treasurer, Virginia owned 300 shares and was president, and Robert owned 400 shares and was vice president. The participation of Virginia and Robert in the affairs of the petitioner as directors and officers was limited to pro forma attendance at meetings of the board of directors. The infrequent board meetings, held at the office of petitioner's counsel, amounted to little more than the occasion for Virginia and Robert to sign the minutes of the meeting, which were prepared prior to the meeting by the attorney in consultation with Lehman. Petitioner paid no compensation to either Virginia or Robert for the years in issue. Lehman was 55 years old in 1967 and had been continuously engaged in the consumer finance business for some thirty years. He caused petitioner to be formed in 1959. He was petitioner's only active officer and general manager of its two loan offices. Among his duties were the hiring and supervising of petitioner's employees, approval of loan applications, collection of delinquent accounts, *55 and preparation of internal records and the reports required to be filed with the Texas Consumer Credit Commission. Lehman was normally present at petitioner's offices for roughly nine hours a day, six days a week. In addition, he would occasionally spend an hour in the evening after business hours or an hour on Sunday working for petitioner. Except for a small amount of time spent in attending to his personal business interests unconnected with petitioner, Lehman devoted all his efforts to petitioner's affairs. During the years in issue, he took no extended vacation from his work for petitioner. Lehman personally interviewed every person who applied to Capitol or Commercial for a loan, except for a small number of applicants who dealt only with the office manager of Commercial. Lehman based his decision on whether or not to approve a loan application and the proper amount of the loan on the information he elicited by interviewing the applicant, on his personal impressions of the applicant, and on credit reports on the applicant routinely obtained from the El Paso Credit Bureau. He also checked delinquent loan accounts, dunned customers by mail and telephone, and, when he considered *56 it necessary, called on customers in person to seek payment. Lehman's fluency in Spanish was an important aid in dealing with petitioner's predominantly Spanish-speaking clientele. The extent of Lehman's responsibilities and, except for periods of inactivity due to illness, the level of his work load remained relatively constant throughout the period 1961 through 1969. During the three years in issue, petitioner regularly employed between eight to ten persons besides Lehman. The office staff consisted of the Commercial office manager, two cashiers, and four or five clerks. The primary duties of the cashiers, who were the more experienced employees on the 1023 office staff, were to disburse cash, prepare the promissory notes each borrower executed, receive payments, keep account of petitioner's cash on hand, and supervise the other members of the office staff. Petitioner's clerical employees did the routine bookkeeping, obtained credit reports on each applicant from the El Paso Credit Bureau, and referred the completed loan application to Lehman for his approval. Petitioner also employed two collectors, who called on delinquent borrowers to seek payment. With the exception *57 of the office manager of Commercial, petitioner paid all of its employees at the minimum wage rate required by law. The office manager of Commercial received total compensation from petitioner of $5,998.70 in 1967 and $4,308.80 in 1968. Following the then office manager's resignation in September 1968, petitioner utilized one of the cashiers in the position of manager of the Commercial office. She was paid a salary of $87.50 per week during her tenure as manager. In April 1969, the cashier returned to her original position and petitioner hired another manager at a salary of $200 per week. The salary of all employees other than Lehman totaled $24,127.20 in 1967, $27,049.14 in 1968, and $30,833.10 in 1969. On June 1, 1970, petitioner sold Commercial to the B & W Finance Company, Inc. For the 12-month period from June 1, 1969 to May 31, 1970, when it was owned and operated by petitioner, Commercial had gross income of $66,646.90 and net profit (taking into account the $12,000 in supervision fees paid to Lehman during that period for his services in connection with Commercial's operations) of $24,907.88. For the 12-month period from June 1, 1970 to May 31, 1971, when it was owned and *58 operated by B & W, Commercial had gross income of $74,896.05 and a net profit of $1,187.74. For his services, petitioner paid Lehman the following compensation: (3)
(2)
Total
(1)
Super-
compen-
Year
Salary
vision
sation
1961
$35,000
$ 3,600
$ 38,600
1962
40,000
3,600
43,600
1963
40,000
5,100
45,100
1964
40,000
5,000
45,000
1965 40,000
8,000
48,000
1966
40,000
16,000
56,000
1967
40,000
16,000
56,000
1968
40,000
18,000
58,000
1969
32,000
24,000
56,000
In its corporate income tax returns for the years 1961 through 1969, petitioner claimed deductions for the compensation paid to Lehman under the two separate categories listed above - officer's salary and supervision expense with respect to the Commercial office. Lehman's individual income tax returns likewise divided his compensation received from petitioner into the two categories of salary and supervision fees. Petitioner's corporate minutes and financial statements similarly divided the compensation paid to Lehman into two categories - the amounts listed above in column (1) being designated as "salary" paid to Lehman for his services as "manager of *59 Capitol Finance Company"; the amounts listed in column (2) being designated as "salary" for Lehman's services as "supervisor of Commercial Finance Company." Petitioner withheld taxes with respect to the amounts listed in column (1) but paid Lehman the amounts listed in column (2) without withholding any taxes. For each of the indicated years petitioner reported the following amounts in its income tax returns: Net income
before
compensa-
Gross
tion to
Taxable
Year
Income
Lehman
income
1961
$134,558
$63,501
$24,901
1962
144,362
70,110
26,510
1963
144,954
80,980
35,880
1964
128,214
69,4 51
24,451
1965
134,102
72,966
24,966
1966
144,952
80,909
24,909
1967
144,854
82,463
26,463
1968
155,575
88,699
30,699
1969
155,893
79,417
23,417
All of petitioner's income in the above years consisted of interest and finance charges on the loans it made and recoveries of bad debts deducted in prior years. Petitioner declared dividends of $5,000 in 1967 and 1969 and distributed them pro rata among its shareholders. At all pertinent times, petitioner operated with a minimal amount of borrowed funds. The table below, *60 derived from petitioner's unaudited financial statements, shows the growth in petitioner's equity: [1] 1024 1967
1968
1969
Equity at beginning of year
$178,165
$198,426
$220,066
Add: Net profits after taxes 20,261
21,640
17,750
Equity at end of year (before dividends)
$198,426
$220,066
$237,816
Percent of equity growth
11.37
10.91
8.07
The following table shows data comparable to that set forth above for small loan companies in Texas whose operations were similar to those of petitioner. [2]
1967
1968
1969
Equity at beginning of year
$18,796,439
$21,697,692
$24,486,746
Net profit after taxes 2,901,253
2,789.054
3,202,186
Equity at end of year
21,697,692
24,486,746
27,506,934
Percent of equity growth
15.44
12.85
12.33 The following table reflects the relationship between petitioner's net profit, before taxes and compensation to Lehman, for the years in issue, as revealed by petitioner's *61 financial statements: 1967
1968
1969
Net profit as indicated above
$82,463
$88,699
$79,417
Compensation to Lehman
56,000
58,000
56,000
Percentage of compensation to net profit as indicated above
67.91
65.39
70.51
The following table reflects the relationship between the net profit, before taxes and interest and the salaries of officers, owners and partners, for the small loan companies in Texas whose operations were similar to those of petitioner. [3]
1967
1968
1969
Net profit
$5,988,885
$5,576,625
$5,930,119
Compensation
2,223,750
1,965,529
2,035,211
Percentage of compensation to net profit as indicated above
37.13
35.25
34.32
*62 The expenses of petitioner (including Lehman's salary and supervision fees) and those of similar small loan companies in Texas (including salaries of officers, owners, and partners) as a percentage of average loans outstanding during the years in issue are as follows: 1967
1968
1969
Petitioner
76.84
77.72
72.05
All loan companies
80.36
81.97
84.01
In his notice of deficiency, respondent disallowed deductions by petitioner for compensation paid to Lehman in 1967, 1968, and 1969 to the extent such compensation exceeded $25,000 in each year. Ultimate Finding of Fact Forty thousand dollars constitutes reasonable compensation for services rendered by Lehman to petitioner in each of the years 1967, 1968, and 1969. Opinion Once again, we are asked to determine whether the laborer was worthy of his hire. Here the laborer was the manager of a small loan business and the hirer was a corporation of which he was the controlling stockholder. 1025 Section 162 limits deductions for salaries to a reasonable allowance. The question of reasonableness is *63 one of fact and the burden of proof is on the petitioner. Anthony Mennuto, 56 T.C. 910, 921 (1971). Each case is sui generis; as one court has put it, "facts and circumstances vary so widely that each corporate tub must more or less stand upon its own bottom." [4] See Miller Mfg. Co. v. Commissioner, 149 F. 2d 421, 423 (C.A. 4, 1945). We see no useful purpose to be served by reviewing in detail the various benchmarks which are operative in arriving at the ultimate determination. See Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115, 119 (C.A. 6, 1949); J. Warren Leach, 21 T.C. 70, 77 (1953). In general, the determination is directed toward an evaluation of whether, considering the employee's qualifications, the nature, scope, and extent of his work, and the size, complexities, and economics of the business, the payments were in fact made for services rendered or were instead disguised dividends. When a shareholder-employee is involved, special scrutiny is the order of the day. Dielectric Materials Co., 57 T.C. 587, 591 (1972); Gem Jewelry Co. v. Commissioner, 165 F. 2d 991 (C.A. 5, 1948).
*64 Our analysis herein is based upon an evaluation of the entire record, including the fact that we saw and heard the various witnesses. We have set forth in our findings only those subsidiary factual elements which we deem essential to an understanding of that analysis and of our ultimate conclusion. There is no doubt that whatever success petitioner had sprang primarily from the personal services of Lehman, petitioner's only executive officer and general manager of its two loan offices. In this connection, we note the drastic decline in the profits of the Commercial office in the year following its sale to B & W Finance Company - a decline most probably attributable to the loss of Lehman's management talents. That Lehman spent some minimal time on his business interests unconnected with the petitioner does not take away from the fact that he devoted whatever efforts were necessary to the successful management of petitioner's affairs. In any event, the question is not the amount of time Lehman spent on his work but the value of his services to petitioner. Hard work alone does not guarantee *65 that the amount of compensation will be considered reasonable. Both petitioner and respondent offered evidence on the compensation paid by other small loan offices in Texas to their officers and managers. Some of the statistical comparison derived from that evidence are set forth in our findings of fact. In addition, we had the benefit of the testimony of the president of B & W Finance Company, the owner of twenty-three other small loan offices at the time of the trial herein, including the Commercial office formerly owned and operated by petitioner. Clearly, such comparisons and testimony are not determinative, but they do constitute an element to be taken into account. Mayson Mfg. Co. v. Commissioner, supra; J. Warren Leach, supra.See also section 1.162-7(b)(3), Income Tax Regs.
We have attempted to adjust the available statistics so as to make them comparable. Thus, for example, in comparing the ratios of expense and officer-owner salaries to the income of similarly situated Texas small loan companies as a group, we have eliminated interest expense in recognition of the fact that petitioner operated for the most part without *66 the use of borrowed funds. In this connection, we also observe that we took into account the fact that Lehman had sufficient adeptness to enable petitioner to operate successfuly without borrowed capital and that, by hiring employees at minimum rates of pay, he was able to keep petitioner's expenses down. The comparisons reveal that, during the years in issue, the percentage of Lehman's compensation to petitioner's net income, before taxes and such compensation, was substantially in excess of the comparable percentage for the average similarly situated small loan company. Yet, during these same years, the percentages of equity growth were comparable. Thus, even if allowance is made for the particular abilities of Lehman and petitioner's consequent success, the inference nevertheless remains that some portion of Lehman's compensation was excessive. There are other factors which point in the same direction. Petitioner's gross 1026 income fluctuated in a relatively narrow range during the period 1961 through 1969; its net taxable income, before Lehman's compensation, moved within a somewhat broader range from a low of $63,501 in 1961 to a high of $88,699 in 1968. During that same *67 period, Lehman's compensation rose from a low of $38,600 to a high of $58,000, absorbing almost the entire increase in profits despite the fact that his services to petitioner did not increase significantly. [5] By way of contrast, during this period, dividends were paid in only two years (1967 and 1969), and then in relatively small amounts. See Mayson Mfg. Co. v. Commissioner, supra.Also significant, in this context, is the fact that the level of petitioner's taxable income hovered, throughout that same period, around the $25,000 mark, so the amount subject to the corporate surtax rate was either eliminated or substantially reduced. In short, we agree with neither the petitioner nor the respondent. Considering the entire record, we have found and hold that $40,000 constitutes a reasonable amount of compensation to Lehman in each of the years 1967, 1968, and 1969. Decision will be entered under Rule 50. Footnotes
1. The figures do not take into account any deduction for dividends paid.↩
2. To effectuate a comparison, interest expense has been eliminated in determining net profit after taxes. See pp. 14-15, infra.↩
3. The underlying data contains an item of expense labeled "Supervision and Administration." We are unable to determine how much of these payments are attributable to services of officers, owners, and partners. Accordingly, we have made no adjustment for this item. We recognize that the data set forth above includes items of income which petitioner did not have, e. g., insurance income; however, it also includes offsetting items of expense related to such income. We are unable, on the record before us, to make a proper adjustment for the foregoing items, but we doubt that they would significantly affect the comparisons so as to change our ultimate conclusion herein. In this connection, we note that petitioner has the burden of proof.↩
4. The reasonableness of compensation to an officer of a finance company has occupied the courts on at least four occasions. O'Brien Finance Co. v. Thomas, an unreported case ( N.D. Tax. 1937, 19 A.F.T.R. 1344, 37-2 USTC 9426); The Barto Co., 21 B.T.A. 1197↩ (1931); Walmor, Inc., a Memorandum Opinion of this Court dated June 18, 1948; United Finance Co., Inc., a Memorandum Opinion of this Court dated May 8, 1943.
5. In this connection, we note that Lehman testified that his compensation for supervision of the Commercial office was "[just] a figure out of the air" at the end of the year.↩