HARRY FOX, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent HARRY FOX and DOLORES FOX, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
HARRY FOX, INC. v. COMMISSIONER
Docket Nos. 2555-77, 2556-77.
United States Tax Court
T.C. Memo 1978-453; 1978 Tax Ct. Memo LEXIS 57; 37 T.C.M. (CCH) 1847-53; November 14, 1978, Filed Coleman E. Klein, for the petitioners. Peter M. Ritteman and Joseph C. Hollywood, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Tax Docket
Year No.
Petitioner(s)
Deficiency
Ended
2555-77
Harry Fox, Inc.
$ 50,399.40
7/31/74
2556-77
Harry Fox and
$ 10,327.95
12/31/74
Dolores Fox
The issue for decision in docket No. 2555-77 is whether the salaries paid by Harry Fox, Inc., to Harry and Dolores Fox in 1974 were reasonable "compensation" for "services actually rendered" *58 within the meaning of section 162(a). [1] The deficiency in docket No. 2556-77 was computed by treating the amount disallowed in docket No. 2555-77 as dividend income for the purposes of section 1348. The decision in docket No. 2555-77 thus controls the disposition of docket No. 2556-77. FINDINGS OF FACT Petitioner Harry Fox, Inc. (hereinafter the company) is a Michigan corporation, and its principal office was located in Roseville, Michigan, when it filed its petition. ,the company filed its Federal income tax return for the fiscal year ended July 31, 1974, with the Central Service Center, Cincinnati, Ohio. Petitioners Harry Fox (Harry) and Dolores Fox (Dolores), husband and wife, were legal residents of Mt. Clemens, Michigan, when they filed their petition. They filed their joint Federal income tax return for 1974 with the Central Service Center, Cincinnati, Ohio. In the mid-1950's Harry worked as a sole proprietor in the tree trimming business. During the latter part of the 1950's he entered the land-clearing business, *59 i.e., the removal of trees, stumps, brush, and other debris from job sites for the construction of highways, schools, residential subdivisions, and factories. Primarily to limit his personal liability, Harry incorporated the company in August 1960, and thereafter operated the business through the corporation. Since the company's incorporation, Harry and Dolores have served as its employees and have been its sole shareholders, and, respectively, its president and secretary-treasurer. They have also served as two of the three members of the company's board of directors. The remaining board member was not a member of petitioners' family. In fiscal year 1961, the company had gross receipts of approximately $200,000. It had only 4 employees, and its jobs were relatively small ones. By 1974 the company had developed the biggest land-clearing business in Michigan, with gross receipts of $1,259,393. Its jobs were larger and it had approximately 75 customers each year. During its peak operating months of April through November, the company employed, in addition to Harry and Dolores, two clerical employees and 30 men assigned to as many as 7 field crews. Carl Madden, a general *60 superintendent employed by the company since 1960, oversaw two of the field crews while working 10 to 11 hours per day during the busy season. In 1974, he was paid approximately $30,000 to $33,000. The wages of the other men working on the field crews in 1974 ranged from $15,000 to $30,000. For a 40-hour work week, the two clerical employees were paid annual wages of approximately $10,000 to $12,000. In the early 1960's the company did its land-clearing work mainly with chain saws. However, as its jobs increased in size, the nature of its equipment changed. In June 1970, in order to comply with local antipollution laws forbidding open burning, the company was required to haul the trees and other refuse removed from the job sites to sanitary land fills. Heavy loading and hauling equipment was purchased for this operation. To qualify for performance bonding, secure advantageous banking arrangements, and obtain governmental and large private construction contracts, the company was required to have adequate equipment. By 1974, the company depended almost entirely upon such heavy equipment as trucks, bulldozers, loaders, hydraulic cutters, and chipping machines. As president *61 of the company, Harry formulated its policies and bore the responsibility for all of its operations. A partial list of his duties is as follows: 1. Solicits and meets with customers; 2. Prepares all bid estimates; 3. Examines plans and specifications for all jobs; 4. Prepares all work orders; 5. Coordinates and supervises field crews; 6. Approves all disbursements; 7. Makes all equipment purchasing decisions; 8. Handles financial matters; and 9. Negotiates all labor contracts. In 1974, during the company's peak operating months, Harry spent 80 to 90 hours a week at his work. During the winter he worked 50 to 70 hours a week. From 1960 to 1974, Dolores was employed in the company's office performing general clerical duties. In Harry's absence she supervised the other clerical employees. Dolores spent approximately 25 hours per week performing her office duties. In addition, she occasionally chauffeured Harry when he inspected prospective job sites. From 1960 to 1974, the company's board of directors held annual meetings on the last day of the company's fiscal year. At those meetings the board authorized salaries for Harry and Dolores for the upcoming *62 year. Beginning in 1965, the directors' resolutions did not specify the amounts to be paid as salaries but rather recited that the salaries were not to exceed stated amounts. The sums actually paid as salaries varied from the amounts authorized as follows: Maximum
Salary
Amount Under Fiscal
Authorized
Per Return
Maximum Authorization Year
Harry
Dolores
Harry
Dolores
Harry
Dolores
Total
1961
$ 25,000
$ 3,000
$ 25,000
$ 3,000
0
0
0
1962
25,000
3,000
25,000
3,000
0
0
0
1963
25,000
3,000 25,000
3,000
0
0
0
1964
25,000
3,000
25,000
3,000
0
0
0
1965
35,000
5,000
35,000
5,000
0
0
0
1966
50,000
10,000
35,000
5,000
$ 15,000
$ 5,000
$ 20,000
1967
75,000
10,000
50,000
10,000
25,000
0
25,000
1968
75,000
10,000
50,000
10,000
25,000
0
25,000
1969
75,000 10,000
60,000
10,000
15,000
0
15,000
1970
75,000
10,000
60,000
10,000
15,000
0
15,000
1971
75,000
10,000 60,000
10,000
15,000
0
15,000
1972
75,000
10,000
75,000
10,000
0
0
0
1973
75,000
10,000
75,000
10,000
0
0
0
$ 110,000
$ 5,000
$ 115,000
During fiscal years *63 1964 through 1973, the company contributed the following amounts to its employees' profitsharing trust: Year
Amount
1964
$ 8,714.94
1965 13,227.16
1966 17,027.08
1967 26,167.38
1968 22,580.54
1969 28,870.00
1970 31,000.00
1971 38,400.00
1972 15% of eligible compensation
1973 15% of eligible compensation
At its meeting on July 31, 1973, the company's board of directors authorized salaries for the following fiscal year not to exceed $175,000 and $15,000 for Harry and Dolores, respectively, and contributions of 15 percent of their eligible compensation to the profit-sharing trust. The minutes of that meeting contain the following: Even though the corporation is still contemplating the purchase of extensive equipment, it was determined to increase the authorization of Officers salaries. It was noted that no significant increase in authorization was made since 1966. Upon motion duly made and seconded, it was unanimously "RESOLVED that the salaries of the Officers of the Corporation being effective August 1, 1973, shall not exceed the following: HARRY FOX
$ 175,000.00 annually
DOLORES E. FOX
15,000.00 annually
*64 The minutes of the meeting of the company's board of directors on July 31, 1974, contain the following: There was a general discussion regarding officers salaries and it was determined that the same authorization be continued for the ensuing year. Upon motion duly made and seconded, it was unanimously "RESOLVED that the salaries of the officers beginning August 1, 1974 shall not exceed as follows: HARRY FOX, President
$ 175,000 annually
DOLORES E. FOX,
Secretary-Treasurer
15,000 annually
If, for any reason, the salaries paid to the above officers are disallowed by the Internal Revenue Service, the amount disallowed shall be paid back by the officer or officers to the corporation. At a meeting on July 31, 1975, the board retroactively reduced the maximum permissible salary for Harry from $175,000 to $110,000 and for Dolores from $15,000 to $10,000. The company reported its income on the accrual method of accounting. Upon completion of a contract, the company reported as income the full price of the contract even though on many construction projects, for which the company was a subcontractor, the general contractors customarily retained 10 to 20 percent *65 of the contract price until the entire construction project had been completed. Full payment was at times delayed for as long as 4 years. Prior to its meeting on July 31, 1973, the company's board of directors anticipated that the company would receive during the fiscal year 1974, a significant amount of money which had been retained by general contractors for work performed in prior years. At the meeting of the company's board of directors held on July 31, 1975, the board authorized a dividend of $2,000 to be paid to the shareholders of record on October 15, 1975. This was the first dividend declared by the company. On its fiscal year 1974 Federal income tax return the company claimed a deduction in the total amount of $190,000 as compensation for Harry and Dolores. Harry and Dolores reported on their 1974 joint Federal income tax return compensation income in the amount of $189,500. In computation of their tax, they included this entire amount as earned taxable income subject to the provisions of section 1348 of the Code. In the notice of deficiency issued to the company, respondent determined that compensation of officers for the fiscal year 1974 was excessive to the *66 extent of $105,000 and allowed a deduction for compensation to them in the amount of $85,000--$75,000 for Harry and $10,000 for Dolores. In the notice of deficiency issued to Harry and Dolores, respondent determined that of the $189,500 paid to them, $105,000 was includable in their taxable income as dividends rather than personal service income. OPINION The amount allowable as a deduction for the "reasonable" compensation of the officers of closely held corporations in individual cases under section 162(a) has been the subject of much litigation. The instant case is somewhat unusual in that petitioners do not contend that the $105,000 disallowed as a 1974 [2] deduction by the company was compensation for that year's services. Rather they contend that the company paid this amount to Harry and Dolores in 1974 to make up for the difference between their maximum authorized salaries and the amounts actually paid them during 1966 through 1971. *67 Section 162(a)(1) allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." It is, of course, settled law that this section does not require that the services for which the payment is made be rendered in the taxable year. A payment may be made and properly deducted in one year for undercompensated services rendered in prior years. Lucas v. Ox Fibre Brush Co.,281 U.S. 115, 119-120 (1930); American Foundry v. Commissioner,59 T.C. 231, 239 (1972), affd. in part and revd. in part 536 F.2d 289 (9th Cir. 1976). From a consideration of all the evidence, however, we are not convinced that the disputed 1974 payments of $105,000 were intended to be, or were, payments of compensation for the earlier taxable years 1966 through 1971. In substance, we hold they were dividends disguised as salary payments. It is true that resolutions were adopted in each of *68 the years 1966 through 1971 authorizing salary payments totaling $115,000 in excess of the amounts actually paid. But those resolutions did not obligate the company to make salary payments in the maximum amounts. Beginning in 1966 and continuing through 1971, the resolutions authorized payments "not to exceed" the stated amounts. Thus, there was no legal obligation on the part of the company to pay the maximum authorized salaries. Since petitioners were two of the three members of the board of directors, the decision not to take the full amount of the authorized salaries in those years was theirs, and that decision as well as the decision to give them the large increase in salaries for fiscal 1974 is subject to special scrutiny. Mennuto v. Commissioner,56 T.C. 910, 921 (1971). We are aware that section 162(a)(1) does not necessarily require, as a condition to deductibility for previously undercompensated services, that a legal obligation be incurred in the earlier years for which *69 the "catch-up" payments are made. Lucas v. Ox Fibre Brush Co.,supra at 119. But the resolution adopted by the board of directors on July 31, 1973, authorizing the salary payments in dispute contains no suggestion that the payments were intended to be compensation for past services. In fact the minutes contain a statement that there had been no "substantial increase" since 1966. This reference to an"increase" in salaries implies an intention to compensate the officers for the current year rather than for prior years. Indeed, at the board of directors meeting on July 31, 1974, "it was determined that the same authorization be continued for the ensuing year," and a resolution to that effect was adopted. We are not convinced, as petitioners argue, that this provision was included in the July 31, 1974, minutes as a result of a clerical mistake. The format of the two sets of minutes, both quoted in our Findings, is different one from the other. The latter set of minutes includes the provision requiring the officers to repay the company for any amounts ultimately disallowed by the Internal Revenue Service as deductions. We think it highly probable that this *70 provision was adopted pursuant to the advice of tax counsel. [3] We are compelled to reject petitioners' explanation of the provision continuing the same salary for the ensuing year. See Mennuto v. Commissioner,supra at 922. We are aware, of course, as argued by petitioners, that the board minutes of small corporations, such as Harry Fox, Inc., are sometimes prepared without due care, and we do not rest our conclusion alone on the inconsistency of these minutes with petitioners' contention that the 1974 large salary increases were back pay. Even giving due account to the possible inaccuracy of those minutes, however, we are not satisfied that the $105,000 increase in fiscal 1974 was needed to bring petitioners' salaries to reasonable amounts in 1966 through 1971. During those earlier years, the actual total salaries paid to Harry and Dolores rose from $40,000 in 1965 and 1966 to $70,000 in 1971. Petitioners would have us find that their salaries should have totalled $60,000 in 1966 and $85,000 in 1967 *71 through 1971, an increase in the latter years of more than 100 percent over the amount ($40,000) paid in fiscal 1965. While Harry, who received the lion's share of the compensation, served effectively as president of the company, we do not think the record will support the reasonableness of such a dramatic increase. During 1974, when the parties at least implicitly agree that $85,000 was reasonable compensation for Harry and Dolores, the company's gross sales were $1,259,393, whereas gross sales ranged from a low of $423,903 in fiscal 1966 to a high of $858,046 in fiscal 1971. Thus, the fiscal 1974 gross sales were approximately 3 times the gross sales in fiscal 1966 and approximately 50 percent greater than in fiscal 1971. [4] In the light of this comparison of the volume of business in the several years, we are not satisfied that additional salary payments are required for 1966 through 1971, when the volume of business was much lower than in 1974, to bring the officers' compensation up to reasonable amounts. In fact, we do not think the record shows that either Harry or Dolores was under-compensated for the services they rendered during 1966 through 1971. *72 In summary, as we view the entire record, the testimony as well as the documents, the salaries paid to Harry and Dolores for 1966 through 1971 fairly compensated them for their services. At the July 31, 1973, board of directors meeting, we think they were aware that the company had due and coming to it substantial amounts retained by the general contractors for whom the company had done landclearing subcontract work. As directors, they decided to provide for the distribution of $105,000 of the company's collections in the form of increases in their salaries. We do not think these increases were intended to be or were compensation for past services. Rather, in substance, we think the $105,000 was a distribution by the company which is taxable to petitioners as a dividend. [5]
*73 To reflect the foregoing, Decisions will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.↩
2. The company reported its income on the basis of a fiscal year ending July 31. The references, which follows, to particular taxable years for the sake of convenience will relate to the company's fiscal years rather than to calendar years.↩
3. See Pahl v. Commissioner,67 T.C. 286, 292-293 (1976); Oswald v. Commissioner,49 T.C. 645↩ (1968).
4. In addition to gross sales, the record contains comparisons of the company's gross profit and reported taxable income for each of the years during this period. However, during that period, the company was purchasing substantial amounts of heavy equipment, and the record does not include an analysis of the effect of accelerated depreciation and other factors which may affect gross profit and taxable income. For that reason a comparison of those items does not provide any reliable guidance as to the volume of business operations in those years.↩
5. For the first time on brief, respondent argued that the company's contributions to its employees' profit-sharing trust to the extent of $28,500 are not deductible. That issue was not raised in the notice of deficiency, the pleadings, or in the opening statement of respondent's counsel at the trial, and it is not, therefore, properly before the Court. Since the case was tried without petitioners knowing that respondent contended that this additional amount should be disallowed, it would be unfair to consider that issue at this point. Our holding is limited to a finding that the company in 1974 deducted $105,000 in excess of the amount allowable as reasonable compensation to Harry and Dolores.↩