DAVID KIPNIS and DOROTHY KIPNIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ARIZONA PLATING & POLISHING CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kipnis v. Commissioner
Docket Nos. 16225-80, 16265-80.
United States Tax Court
T.C. Memo 1982-471; 1982 Tax Ct. Memo LEXIS 277; 44 T.C.M. (CCH) 849; T.C.M. (RIA) 82471; August 11, 1982. James Silhasek, for the petitioners. Michael K. Phalin, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Docket No.
Petitioner
Ended
Deficiency
16225-80
David Kipnis and
12/31/76
$ 8,293
Dorothy Kipnis
16225-80
David Kipnis and
12/31/77
$ 9,222
Dorothy Kipnis
16265-80
Arizona Plating &
3/31/77
$42,729
Polishing Co.
16265-80
Arizona Plating &
3/31/78
$36,425
Polishing Co.
The parties have reached agreement on certain adjustments to which the determined deficiencies are *279 attributable, and the following issues remain for decision: 1. What amounts of the bonus payments made by American Plating & Polishing Co. to David Kipnis in each of the taxable years 1977 and 1978 constitute "reasonable compensation" for "services actually rendered" within the meaning of section 162(a); [1]
2. What amounts of such bonus payments in the hands of David Kipnis constitute compensation which is subject to the maximum tax provisions of section 1348; 3. Whether the American Plating & Polishing Co. is entitled to a partial bad debt deduction under section 166(a)(2) in the amount of $9,465 with respect to its claim against Chrome Co.; 4. Whether David Kipnis realized a constructive dividend from Arizona Plating & Polishing Co. in the amount of $18,930 when that corporation released its claim against Chrome Co. in connection with David Kipnis' disposition of his Chrome Co. stock. FINDINGS OF FACT General Facts
Petitioners in docket No. 16225-80, David Kipnis and Dorothy Kipnis, are husband and wife (the Kipnises). *280 They filed joint Federal income tax returns for 1976 and 1977 with the Internal Revenue Service Center, Ogden, Utah. When they filed their petition, the Kipnises were legal residents of Phoenix, Arizona. They used the cash receipts and disbursements method of reporting their income. Petitioner in docket No. 16265-80, Arizona Plating & Polishing Co. (A. P. & P. or the company) is a corporation organized under the laws of the State of Arizona. [2] It timely filed U.S. Corporation Income Tax Returns for its taxable years ended March 31, 1977 and March 31, 1978, with the Internal Revenue Service Center, Ogden, Utah. On the date of filing its petition, A. P. & P.'s principal place of business was in Phoenix, Arizona. During the periods in question, the company used the accrual method of accounting. Issues 1 and 2.
Facts Relating to Reasonable Compensation and Maximum Tax Issues
David Kipnis (David), president and general manager of A. P. & P., graduated from the University of Chicago in 1945 with a degree in chemical engineering. He moved to Phoenix, Arizona, and *281 in 1947, along with his wife (Dorothy) and one employee, started a chrome plating business. This business initially involved chrome plating of plumbing fixtures; there was a market for such work because many plumbing fixtures manufactured during World War II for civilian use were merely polished rather than chrome plated due to a wartime shortage of chrome. In about 1949, the supply of unplated plumbing fixtures was depleted and David converted his plating business into a "job shop", taking work in "off the street," and later into a production type of business, doing production work for such companies as Air Research and General Electric. David incorporated his business in 1956, with an original capitalization of about $5,000. In addition to this initial investment, over the years David and Dorothy invested money from other sources in A.P. & P. Moreover, they personally guaranteed substantial loans made by banks to the company. David and Dorothy comprised the company's entire board of directors. During the taxable periods in question, David owned 90 percent or more of the company's issued and outstanding capital stock; the remaining 10 percent or less was owned by a trust for *282 the company's stock bonus plan, which bought its stock from David. In 1967, David again modified his plating business by concentrating on manufacturing and recycling steel car bumpers. The recycling, which consisted of stripping damaged bumpers and straightening, repairing, and replating them, became A.P. & P.'s primary business after 1967. David designed and developed new equipment and techniques useful in the recycling process. He designed, for example, the dies used to straighten and form the bumpers, the racks used to chrome plate the bumpers, an electric hammer for pounding out dents, a stroke sander, a polishing machine, and modified a wrapping machine. The value of the dies alone was approximately $3,000 to $5,000 a set; at the time of trial, A.P. & P. had 294 sets of dies. David never attempted to patent any of his machine or tool designs, but made them freely available to others in the industry. He also gave tours of his plant to interested businessmen. With the introduction of aluminum automobile bumpers, David turned his attention to developing a process for recycling aluminum bumpers. He did some experimental work and a limited amount of manufacturing in 1976. *283 Manufacturing of recycled aluminum bumpers began on a production basis in 1977. Aluminum bumpers posed reclamation problems not encountered with the heavier steel bumpers, and thus necessitated new processes. Instead of the chrome plating process, David developed an anodizing process for the aluminum bumpers. This process involved, in part, stripping off an anodic film, reshaping and polishing the bumper, and applying a new anodic coating. David alone devised this process, developing everything from the requisite electrical formulas to the designs for the needed new machines. As of the trial in this case, only one other company was engaged in aluminum bumper recycling on a production basis. Along with the aluminum bumper process, A.P. & P. continued with its steel bumper recycling work. In addition to making these innovations for reprocessing aluminum bumpers, David controlled virtually all aspects of A.P. & P. His duties as president and chief executive officer from March 31, 1968 through March 31, 1978, included: 1. Hiring and training new employees; 2. Purchasing raw materials and chemicals; 3. Determining the electrical formulas to be used for each plating process; *284 4. Determining the mixture of chemicals for each plating process; 5. Devising and experimenting with new processes and equipment; 6. Supervising production and plating; 7. Soliciting and negotiating with customers throughout the United States and Canada; and 8. Supervising financial matters. This extensive involvement required long hours of work. He often rose at 5:15 a.m. to conduct business by telephone with customers on the east coast, and remained at the plant during all or part of both shifts (7 a.m. to 3:30 p.m. and 4:30 p.m. to 1:30 a.m.). Introduction of the aluminum bumper recycling business in 1977 increased A.P. & P.'s profitability. The aluminum bumpers brought in additional sales, while the sales of recycled steel bumpers remained roughly constant during fiscal years ending (FYE) in 1977 and 1978, (that is, at the FYE 1976 level of $1,515,531). In the first 3 months of 1977, aluminum bumper sales alone accounted for an increase of $55,890.20 in total bumper sales over the same months of 1976. [3] The company's total sales of bumpers (steel and aluminum) reached $1,571,421.33 for the taxable year ended March 31, 1977, and $1,799,860.86 for the year *285 ended March 31, 1978. [4]
David's salary increased during this profitable period in the life of A.P. & P. During the early years of the company's life, his salary fluctuated, ranging from $150 to $300 per week. The following schedule shows the company's total sales (bumper and nonbumer items) and taxable income (after deducting all salaries and bonuses), as well as David's salary, David's bonuses, and declared dividends for the following taxable years (the figures are rounded for convenience): Taxable
Year
A.P. & P.'s
Ending
All
Taxable
David's
David's
Mar. 31
Sales
Income
Salary
Bonus
Dividend
1968
$573,500
$22,999
$35,000
1969
700,400
28,400
35,000
1970
878,900
46,900
42,000
1971
817,500
17,800
42,000
1972
854,000
26,000
42,000
1973
1,029,300
54,500
42,000
1974
1,129,300
14,900
42,000
1975
1,239,500
33,100
52,000
1976
1,517,500
66,500
75,000
1977
2,044,600
52,900
75,000
$100,000
$6,000
1978
2,411,500
140,300
100,000
100,000
6,000
*286 According to the corporate minutes, the two bonuses to David were authorized at the company's annual joint meeting of stockholders and board of directors; David and Dorothy constituted the board of directors and were, or represented, the stockholders. The resolution directing payment of the 1977 bonus is included in the minutes of a March 30, 1977, meeting and reads as follows: RESOLVED that this corporation pay to its president, David H. Kipnis, a bonus in the amount of $100,000 for past services rendered for favorable years during which profits of the business did not warrant payment to him at that time. At that meeting, a dividend of $6,000 to all shareholders of record was authorized (50 cents a share). Also authorized were David's salary ($100,000 for the year starting April 1, 1977) and a contribution to the stock bonus plan of $77,837.38 of covered compensation. The minutes for this meeting bear the signed date of July 14, 1978. At the next year's annual meeting, held on March 28, 1978, the minutes indicate that bonuses were authorized as follows: RESOLVED, that bonuses be paid to the following persons in the amount set opposite their names: David H. Kipnis
$100,000
George Reich
$  5,000
Joseph Eulate
$  2,000
Robert Kokesh
$  1,000
Kip Tegman
$  1,000
Gerald Stovall
$  1,000
Jerry Greitzer
$  5,016
*287 These individuals were all employees of A.P. & P., holding supervisory or semi-managerial positions (e.g., plating and polishing foreman, senior local salesman), though none but David had autonomy or real decision-making powers. In 1976, no employee of A.P. & P. other than David was paid over $17,000; in 1977, two employees made between $18,000--$18,999, while the rest were paid $17,000 or less. [5] Some employees had been with A.P. & P. for 17 years or more as of the trial. A dividend in the amount of $6,000 was also authorized at this March 28, 1978, meeting. The company's net profits before deduction of David's salary, deferred compensation contributions and bonus were approximately $240,000 for FYE 1977, and $375,000 for the following fiscal year. [6] As reported *288 on its corporation income tax returns, A.P. & P. had retained earnings as of March 31, 1977, of $317,704 and $402,620 as of March 31, 1978, together with a capital stock account of $1,200,000 in both years. In his notice of deficiency, respondent determined that portions of the bonuses paid to David exceeded a reasonable amount for salaries or other compensation for personal services rendered within the meaning of section 162(a). Respondent allowed the company to deduct as salary $75,000 and $100,000 for fiscal years ending 1977 and 1978, respectively, and bonuses equaling 1 percent of the company's total sales for each taxable year ($20,446 for FYE 1977, and $24,115 for FYE 1978). Thus, respondent disallowed a corporate deduction of $79,554 and $75,885 *289 for the respective taxable years, and determined that for David individually the excess amounts paid in 1977 were not received as compensation for personal services within the meaning of the maximum tax provisions of section 1348. Issues 3 and 4.
Facts Relating to the Bad Debt and Constructive Dividend Issues
In addition to his extensive involvement with A.P. & P., David was president of Chrome Company (Chrome), an Arizona corporation engaged in the plating business in Tucson. On November 12, 1969, Chrome issued 5,000 shares, which constituted 50 percent of its outstanding capital stock, to David and Dorothy Kipnis for $5,000. The remaining 50 percent of the outstanding stock was issued to Harry S. and Rose Fake (the Fakes). Rose Fake was the secretary, treasurer, and manager of Chrome, and was assisted by her husband, also an employee of Chrome. David did not supervise Chrome's daily affairs. Prior to June 26, 1976, A.P. & P. sold merchandise to Chrome on an open account and, as of June 26, 1976, Chrome owed A.P. & P. $18,929.98 on these sales. No major shipments were made on account to Chrome in the latter part of 1975, and after April 30, 1976, all shipments *290 were made C.O.D. Also, as of June 26, 1976, Chrome owed David an unpaid balance of $35,754 on prior cash advances he had made to Chrome. On June 28, 1976, David filed a complaint in the Superior Court of the State of Arizona on behalf of Chrome against the Fakes, alleging mismanagement and praying for the appointment of a receiver, an accounting, and other relief. Following the issuance of a Show Cause Order on July 1, 1976, David and the Fakes agreed to postpone the hearing and entered into an agreement for the settlement of their disputes. The agreement as consummated called for Chrome to redeem David's stock for $37,000 and for David to release all claims against the Fakes and Chrome. In a letter dated July 1976, setting forth the terms of the proposal, the following provision appears: A condition of consummation of the corporation's [Chrome's] purchase option is that Kipnis shall procure from Arizona Plating and Polishing Company (also known as Arizona Plating and Anodizing Company) a complete release of all liability of the corporation [Chrome], said liability presently being in the approximate amount of $18,929.98. Kipnis covenants and warrants *291 that he will procure such a complete release, it being the intention of Fakes, Kipnis and the Corporation that procurement of such complete release is an absolute condition to consummation of the corporation's purchase option. [Emphasis added.] The redemption took place on August 18, 1976, with the Fakes transferring to David a note secured by a deed of trust in the amount of $27,000. Also dated August 18, 1976, is a letter signed by David Kipnis to Chrome stating that "[b]y this letter, Arizona Plating and Polishing Company * * * hereby releases Chrome Company from any and all liability * * * said liability presently being in the approximate amount of $19,000." The release of liability was to be termed "absolute and complete" for all prior matters or transactions. The closing memorandum, also dated August 18, 1976, and signed by David, the Fakes, and the parties' attorneys, states that David delivered (1) his stock certificate, (2) his resignation as an officer and director, (3) the release [of A.P. & P.'s claim], and (4) all corporate documents in his possession, while the Fakes delivered (1) $10,000, (2) a corporate resolution authorizing the corporation to *292 purchase David's stock, (3) the $27,000 promissory note, and (4) a deed of trust securing the note. The closing memorandum also states that David "shall have no claim against * * * [Chrome] with respect to capital contributions, loans or advances" made to Chrome. The minutes of an A.P. & P. shareholders and directors meeting of March 30, 1977, some 7 months after David's deal with the Fakes was consummated, indicate that a discussion occurred concerning "the fact that there was due from Chrome Company a receivable in the amount of $18,929.98. [David] noted further that Chrome Company was clearly unable to pay this business debt, although Arizona Plating & Polishing Co. was attempting to recover that amount, and that the value of the receivable from Chrome Company was, at most, 50% of the account receivable balance. [David] indicated that he was attempting to sell his 50% interest in Chrome Company to an unrelated party. The sale would be paid over a period of time and, if paid in full, David Kipnis would pay an amount equal to one-half of the uncollectible receivable gratuitously to this corporation. Again noting that at least one-half of the receivable from Chrome Company *293 was uncollectible, the following resolution was adopted: RESOLVED, that this corporation waive payment of a business debt payable to it from Chrome Company as uncollectibe in the amount of $9,464.99; and FURTHER RESOLVED, that the president is hereby authorized and shall notify the corporation's accountant to reflect on the books and records of the corporation that said receivable in the amount of $9,464.99 is deemed to be uncollectible and is to be written off as a bad debt." The minutes do not mention the release of the Chrome debt delivered to the Fakes on August 18, 1976. On March 31, 1977, the Chrome account receivable of $18,929.98 was written down by journal entry to $9,464.99. The 50 percent that was written off was then deducted as a bad debt on the company's income tax return for the taxable year ended March 31, 1977. A check dated March 30, 1979, was written by David to A.P. & P. in the amount of $9,464.99. Below David's name appears the printed legend "Race Horse Account"; it also shows a handwritten notation "Chrome Co. payment." This latter notation was added about 1 year after the check was written, or around March 1980. In his notice of deficiency to *294 David, dated May 1980, respondent determined that during 1976 David caused A.P. & P. to release Chrome from the $18,930 indebtedness as part of the Chrome stock transaction, and that this release for his benefit was a taxable dividend from A.P. & P. under sections 301 and 316. Respondent allowed this $18,930 as a contribution to Chrome's capital and included it in his basis in computing David's loss on the disposition of his Chrome stock. Respondent also determined, in his notice of deficiency to A.P. & P., that A.P. & P. was not entitled to a bad debt deduction of $9,465, representing 50 percent of the $18,930 Chrome indebtedness, for the FYE March 31, 1977, "because it has not been established that the $18,930 debt of Chrome Company became partially worthless in that year. Instead this debt was forgiven as a part of the consideration in the sale of property by David Kipnis to the Chrome Company." OPINION Issues 1 and 2.
The Reasonable Compensation and Maximum Tax Issues.
We are again called upon to decide the amount of compensation that is reasonable for a corporation to pay its controlling shareholder-chief executive officer. Undoubtedly, David Kipnis, the chief *295 executive officer of A.P. & P. was the galvanizing force of a highly successful recycling business. He provided the company with a superb combination of practical technical knowledge and highly effective administrative and financial leadership. Section 162(a)(1), [7] however, limits A.P. & P.'s deduction for his compensation to "a reasonable allowance" and to amounts paid for "services actually rendered." Paula Construction Co. v. Commissioner,58 T.C. 1055, 1058 (1972); Electric & Neon v. Commissioner,56 T.C. 1324, 1340 (1971). Moreover, section 1348[8] prescribes the maximum tax to be paid on "personal service taxable income," and that limitation refers to compensation and not to disguised dividends. As petitioner concedes, to the extent that amounts paid to an employee are not "reasonable compensation," the excess amounts do not constitute "personal service income" so as to qualify for the 50 percent maximum tax. Kennedy v. Commissioner,72 T.C. 793, 805-806 (1979), revd. on other grounds *296 671 F.2d 167 (6th Cir. 1982). Thus, our decision as to the "reasonableness" of David's "compensation" controls the tax treatment of the excess amounts both for A.P. & P. and for David individually. *297 Whether payments constitute reasonable compensation for services rendered is a factual issue to be decided on the basis of the facts and circumstances of the case. Paula Construction Co. v. Commissioner,58 T.C. at 1059; Electric & Neon, Inc. v. Commissioner,56 T.C. at 1340. Petitioners have the burden of proving that such amounts were intended to be, and were, paid as compensation. Botany Worsted Mills v. U.S.,278 U.S. 282 (1929); Home Interiors & Gifts,Inc. v. Commissioner,73 T.C. 1142, 1155 (1980). Because David was in complete control of A.P. & P.'s affairs and, along with his wife, exercised total authority over the payment of salaries, bonuses, and dividends, close scrutiny must be given to the relevant facts in order to ascertain whether portions of the salaries and bonuses were, in fact, distributions of earnings. Paula Construction Co. v. Commissioner,58 T.C. at 1058; Mennuto v. Commissioner,56 T.C. 910, 921 (1971). While numerous factors have been considered in analyzing the reasonableness of compensation, see *298 Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court, they generally involve evaluating: (1) the nature, quality, and quantity of the employee's services (e.g., employees's qualifications, extent of services, complexities of the business) and (2) the company's fiscal history (e.g., recent profits, comparison of salaries to gross and net income, dividend history, capital investment, salaries paid to other employees, and comparisons with similar companies). We agree heartily with petitioners' argument on brief that David was the guiding light and dynamic force of A.P. & P. A businessman of considerable skill, he was obviously an imaginative manager who modified the company's activities to enable it to acquire new markets and who devised innovative technology to permit profitable changes when they were needed. He worked hard and devoted many hours to his labors. Indeed, one of petitioners' witnesses, a Regional Sales Manager for a division of a subsidiary of Gulf Oil Corporation, testified that, where bumper companies "vary from the ridiculous to the sublime, " David's operation fell "in the sublime area." *299 Nonetheless, David's outstanding qualities do not negate the statutory dictate that his compensation, to be deductible, must be reasonable in amount. The second general category of factors (relating to the company's fiscal history) raise serious doubts as to the reasonableness of David's compensation in fiscal years ended 1977 and 1978. The company's failure to pay dividends for many years, coupled with the minimal amounts declared in the years in issue, is itself a red flag. See Nor-Cal Adjusters v. Commissioner,503 F.2d 359, 362 (9th Cir. 1974), affirming a Memorandum Opinion of this Court. The company began with capital of only $5,000. As a result of the retention of its earnings and additional investments, however, A.P. & P.'s capital stock account stood at $1,200,000; its retained earnings account had a balance of $402,620, and it had assets in excess of $2,000,000 at the end of fiscal year 1978. The company's earnings in fiscal years ending 1977 and 1978 were thus attributable to the use of its substantial capital as well as its superior management. A.P. & P. was by no means a personal service business. [9]
*300 Moreover, the salaries of other employees, even those who had worked for the company for as long as 17 years, were drastically lower than David's. We recognize that the duties of those employees were considerably less demanding than were David's, but the disparity in compensation ($17,000 v. $75,000 and $100,000, maximum bonuses of about $5,000 v. $100,000) raises further doubts as to the reasonableness of David's compensation. The combination of minimal dividends and a substantial accumulation of earnings, plus the "radical" increase in overall compensation to the (essentially) sole shareholder, we find "particularly significant." See Pacific Grains, Inc. v. Commissioner,399 F.2d 603, 606-607 (9th Cir. 1968). Setting the amounts for bonuses, moreover, was done according to no formula but apparently only by considering the net profits of the company in the tax years and the personal interests of the highly interested board of directors consisting only of David and Dorothy Kipnis. The facts thus all indicate that the bonuses paid to David by A.P. & P. for fiscal years ending 1977 and 1978 were designed in part as "a method of draining off corporate profits at *301 a tax advantage." Pacific Grains, Inc. v. Commissioner,supra at 606. Analysis of the ratio of David's total compensation (salary, bonus, deferred compensation) to the company's taxable income prior to deducting such compensation were approximately 79 percent and 63 percent, respectively, for the company's taxable years ended March 31, 1977, and March 31, 1978. [10] Had no bonuses been paid in those 2 years, A.P. & P.'s taxable income would have increased from $66,500 in FYE 1976, to $152,900 in FYE 1977 and to $240,300 in FYE 1978. Again, these facts warrant the inference that David, by directing his large bonus payments for the first time in FYE 1977 and continuing them in FYE 1978, attempted to remove substantial amounts of corporate income to his individual account, thereby avoiding corporate income tax on that amount and subjecting his own income to a maximum 50 percent marginal tax rate. The large increase *302 in David's compensation in fiscal years ended 1977 and 1978 cannot be justified by comparing A.P. & P.'s sales increases in those years with David's compensation increases. A.P. & P.'s sales rose in fiscal years ended 1976, 1977 and 1978 from $1,517,500 to $2,044,600 to $2,411,500. David's paid compensation during this period increased in those 3 years from $75,000 to $175,000 to $200,000. Thus sales increased for FYE 1977 by approximately 35 percent over FYE 1976, while David's compensation increased 133 percent. Between FYE 1976 and FYE 1978, the sales increased by approximately 59 percent, while David's compensation increased 166 percent. Petitioners make two main arguments to support the reasonableness of the compensation paid: first, directed mainly to FYE 1977, that the increase was intended to rectify undercompensation in prior years; second, directed principally to FYE 1978, that the salary increases and bonuses were designed to compensate David mainly for his services in developing the aluminum bumper anodizing process, which was allegedly responsible for greatly increased profits. We think there is some merit in petitioners' first argument, directed mostly to FYE *303 1977--that the first $100,000 bonus was intended in part to make up for prior years in which David was underpaid. To support their case, petitioners point to the corporate resolution of the March 30, 1977, shareholders and directors meeting which stated that David would be paid a $100,000 bonus "for past services rendered for favorable years during which profits of the business did not warrant payment to him at that time." It is well established that a corporation may deduct, under section 162(a)(1), reasonable additional compensation paid to officers for services in prior years. Lucas v. Ox Fibre Brush Co.,281 U.S. 115 (1930). While the March 30, 1977, resolution may be read to evidence an intent that the bonus be recompense for past services, it does not sustain petitioners' burden. We must bear in mind, after all, that this resolution was passed by David and Dorothy Kipnis and, for that reason alone, cannot be accepted without analysis. David testified that in A.P. & P.'s early years (1956 to 1968), he received "very nominal amounts, $300 a week, sometimes, sometimes a hundred and fifty." By 1968, the company had developed a thriving bumper plating business *304 with sales in excess of $500,000 and had laid the foundation for sustained growth. Petitioners emphasize that the company's sales increased greatly from FYE through 1976 (from $573,500 to $1,517,500), while David's salary increased comparatively much less, thus evidencing undercompensation from 1968 through 1976. It is true that his salary remained constant ($42,000) from FYE 1970 through FYE 1974. On the other hand, as respondent points out, the big consistent increase in sales began after FYE 1972, rising from FYE 1972 ($854,000) through 1976 ($1,517,500) by 78 percent, from FYE 1972 to FYE 1976, David's salary likewise increased by 79 percent. In the light of all the evidence, we think that a bonus for FYE 1977 somewhat larger than the $20,446 (1 percent of sales) approved in the notice of deficiency as compensation for past services is justifiable. We find that a bonus of $61,338 (3 percent of sales) is reasonable. As to FYE 1978, petitioners argue that the increase was intended to compensate David for his services in devising the new anodizing process for aluminum bumpers. David testified, however, that aluminum bumper production did not begin at all until calendar *305 year 1977. In that year, the sales attributable to this process came to only $55,890. For FYE 1978, A.P. & P.'s sales volume from aluminum bumpers was approximately $284,330. [11] As respondent points out, the total bumper sales accounted for approximately 75 percent of total sales of $2,411,500, and the aluminum bumper sales accounted for approximately 16 percent of total bumper sales, or 12 percent of all sales. While the aluminum bumper sales increase of $284,330 is noteworthy, we are not convinced that it alone justifies a salary increase of $25,000 plus a bonus of $100,000. In the light of all the evidence, we think that respondent's determination for FYE 1978 allowing the $25,000 salary increase (to $100,000) plus $24,115 of the bonus (1 percent of sales) plus the stock bonus contribution constitutes reasonable compensation for David's services rendered. Issues 3 and 4.
Bad Debt Deduction and Constructive Dividend Issues
As a "condition" of the redemption of his 50 percent interest in Chrome stock, David, as president of A.P. & P., signed a letter releasing Chrome from an *306 $18,930 indebtedness to A.P. & P. He received consideration valued at $37,000 from the sales transaction. Nearly 3 years later, he wrote a check to A.P. & P. for half of this amount; the check bears the handwritten notation "Chrome Co. payment." A.P. & P. deducted as a bad debt one-half of this indebtedness ($9,465) in FYE 1977. Respondent denied A.P. & P.'s partial bad debt and determined that the release constituted a constructive dividend to David in calendar year 1976 (sections 301, 316), which should be added to his basis in computing the loss from the redemption of his Chrome stock. a. The alleged bad debt loss.Section 166(a)(2) provides that, when the Secretary is "satisfied that a debt is recoverable only in part," he may allow a deduction "in an amount not in excess of the amount charged off within the taxable year." [12] Before a taxpayer "may deduct a debt in part, he must be able to demonstrate to the satisfaction of the district director [of the Internal Revenue Service] the amount thereof which is worthless and the part thereof which has been charged off." Sec. 1.166-3(a)(2)(iii), Income Tax Regs. In view of the structure of section 166(a)(2) and the accompanying *307 regulation, "[t]he courts have consistently held that the Commissioner's judgment is controlling unless it is plainly arbitrary or unreasonable." Dodd v. Commissioner,298 F.2d 570, 579 (4th Cir. 1962), affg. a Memorandum Opinion of this Court; Bullock v. Commissioner,26 T.C. 276, 299 (1956) affd. per curiam 253 F.2d 715 (2d Cir. 1958); Findley v. Commissioner,25 T.C. 311, 318 (1955), affd. per curiam 236 F.2d 959 (3rd Cir. 1956); Wilson Bros. & Co. v. Commissioner,124 F.2d 606, 609 (9th Cir. 1941). The evidence falls far short of showing that the denial of the bad debt deduction was plainly arbitrary or unreasonable. The record contains no financial statements such as balance sheets, operating *308 statements or valuations of Chrome's assets or its liabilities in the early part of FYE 1977 in which the decision was allegedly made to charge off one-half of the Chrome debt. Without concrete evidence on Chrome's financial condition demonstrating that the full amount of the debt could not be collected, we cannot find that denial of the deduction for a partially worthless debt was erroneous. The record does show that David tried unsuccessfully for several months to collect A.P. & P.'s claim against Chrome prior to April 1, 1976.He testified that he told Rose Fake, one of Chrome's other shareholders, that A.P. & P. would put the account into the hands of a lawyer for collection if it was not paid and added that "if you want to avoid that, we'll settle for 50 percent of it." That conversation with Rose Fake is practically the only evidence to which David points to demonstrate that the debt was partially worthless. But the testimony regarding that conversation is not sufficient to show that A.P. & P. relinquished any part of its claim. Moreover, even that conversation carries with it the implication that a greater amount than one-half could have been collected by court action.And, *309 as a matter of fact, David did cause Chrome to initiate suit against the Fakes around July 1, 1976, for an accounting, and that suit led to the stock redemption. Further, as evidence that the debt was not partially worthless, in July 1976, David offered to pay $30,000 for the Fakes' stock in Chrome on the understanding that the accounts payable did not exceed $26,000. As an alternative, he offered to take $37,000 for his half of the stock on the condition that he furnish "a complete release of all liability of the Corporation" to A.P. & P., "said liability being in the approximate amount of $18,929.98." [13] The Fakes elected to buy his stock. That the Fakes were willing to pay $37,000 for one-half of Chrome's stock (subject to the release of the A.P. & P. claim) indicates strongly that the whole of A.P. & P.'s claim was collectible and that none of it was worthless in the early part of FYE 1977. We cannot find that the notice of deficiency was erroneous in denying A.P. & P.'s claimed partial bad debt deduction. *310 b. The alleged constructive dividend.As for the constructive dividend issue, section 316(a) defines a dividend as "any distribution of property made by a corporation to its shareholders" from earnings and profits; [14] such dividends are, of course, includable in the recipient shareholder's gross income. Secs. 61(a)(7); 301. "Where a corporation confers an economic benefit on a shareholder without the expectation of repayment, that benefit becomes a constructive dividend, taxable to the shareholder, even though neither the corporation nor the shareholder intended a dividend." Magnon v. Commissioner,73 T.C. 980, 993-994 (1980). However, "not every corporate expenditure which incidentally confers economic benefit on a shareholder is a constructive dividend." The crucial test is whether "the distribution was primarily for the benefit of the shareholder." Loftin & Woodward, Inc. v. United States,577 F.2d 1206, 1214 (5th Cir. 1978); Crosby v. United States,496 F.2d 1384, 1388 (5th Cir. 1974); *311 Magnon v. Commissioner,supra at 994.
We think that A.P. & P.'s release of its claim against Chrome was intended primarily to confer an economic benefit upon David. We think it quite clear that David was embroiled in a controversy with the Fakes, his co-shareholders in Chrome. Around July 1, 1976, he had caused Chrome to institute a lawsuit against the Fakes, charging "malfeasance or misfeasance" and demanding an accounting. He wanted the Fakes out of Chrome or he wanted out. A.P. & P's release of its claim can best be viewed, we think, as part of the consideration David offered in the deal to sell his Chrome stock. He sold his stock plus the release in exchange for $10,000 cash and a $27,000 note. Without the release, he would have received less in redemption of his stock (if, indeed, any redemption would have occurred). A.P. & P. granted the economic benefit in the form of the release, moreover, without expectation of repayment. *312 There is no written evidence, however informal, of a loan from A.P. & P. to David. The only written record referring to any repayment (the minutes of the March 30, 1977, meeting of A.P. & P's directors) states that, upon David's receipt of full payment for his stock, he would pay one-half of the "uncollectible receivable gratuitously" to A.P. & P.[15] Not only was this repayment termed, in effect, a contribution of capital, but also its conditional nature prevents it from being treated as an obligation to pay for the release: Only if Chrome paid its note to David in full would David's "promise" be activated. See Gibbs v. Tomlinson,362 F.2d 394, 397 (5th Cir. 1966). Given Chrome's prior performance on honoring its debt, such full payment was somewhat tenuous. [16] At the time the benefit was conferred by the debt's release, see Benes v. Commissioner,42 T.C. 358 (1964), affd. 355 F.2d 929 (6th Cir. 1966), we think there was at most a moral commitment on David's part to hisown wholly owned corporation to pay $9,465, but that was contingent upon his receiving the full $37,000 from Chrome.[17]
*313 David has not shown that the amount of the constructive dividend does not correspond to the stated amount released. We are not convinced that the debt was actually worth less than $18,930 or that the release was worth less than its face value. We recognize that preceding the sale, the debt had proved exceedingly nettlesome to David, but Chrome was apparently solvent; it did pay $10,000 cash in partial redemption of David's stock and, for the stock and the release, he received also the secured $27,000 note. The debt being worth $18,930, we think that the release of the debt, which David delivered to Chrome as consideration, was likewise worth $18,930 and that A.P. & P. conferred an economic benefit in this amount to David. Our conclusion is bolstered by more of David's seemingly contradictory testimony. He stated that he offered to buy the Fakes' stock for double the price at which he would sell his. Yet the documents indicate that David offered to buy for $30,000 (provided Chrome's accounts payable did not exceed $26,000) and to sell his stock together with the release for $37,000.This proposal in itself thus indicates that the essence of the transaction was a sale by David *314 of stock plus the release of A.P. & P.'s claim of $18,930. No other interpretation accounts for David's receiving $7,000 more than he would have paid for the Fakes' stock. We conclude, considering all the evidence, that A.P. & P.'s voluntary release of the $18,930 debt owing from Chrome constituted a constructive dividend of $18,930 to A.P. & P.'s controlling shareholder in his calendar year 1976. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
2. At one point, Arizona Plating & Polishing Co. was known as Arizona Plating and Anodizing Co.↩
3. ↩
Month
1976
1977
Increase in Bumper Sales
January
$127,105.05
$142,824.67
$15,719.62
February
121,466.99
138,240.24
16,773.25
March
147,212.41
170,609.74
23,397.33
Totals
$395,784.45
$451,674.65
$55,890.20
4. Sometime after Mar. 31, 1978, David formed another corporation, Arizona Aluminum Bumper, to which he transferred the company's recycled aluminum bumper manufacturing operation.↩
5. The specific breakdown of compensation is stipulated as follows: ↩
Salary
1976
1977
$4,200 -  12,000
49
53
12,000 -  12,999
6
5
13,000 -  13,999
3
5
14,000 -  14,999
6
5
15,000 -  15,999
2
2
16,000 -  16,999
1
2
17,000 -  17,999
0
0
18,000 -  18,999
0
2
19,000 - 100,000
0
0
100,000 and over
1
1
Total Employees Represented
68
75
6. The net profits are computed as follows: ↩
Year Ended
Year Ended
Mar. 31, 1977
Mar. 31, 1978
Taxable Income on Return
$ 52,877
$140,284
Current Compensation Deducted on
Return
175,000
200,000
Contribution to Stock Bonus Plan
Deducted on Return
8,517
30,050
Reasonable Estimate of Contribution
to Defined Benefits Plan Deducted
on Return
5,000
5,000
Total
$241,394
$375,334
7. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; ↩
8. SEC. 1348. 50-PERCENT MAXIMUM RATE ON PERSONAL SERVICE INCOME. (a) General Rule.--If for any taxable year an individual has personal service taxable income which exceeds the amount of taxable income specified in paragraph (1), the tax imposed by section 1 for such year shall, unless the taxpayer chooses the benefits of Part I (relating to income averaging), be the sum of-- (1) the tax imposed by section 1 on the highest amount of taxable income on which the rate of tax does not exceed 50 percent, (2) 50 percent of the amount by which his personal service taxable income exceeds the amount of taxable income specified in paragraph (1) of this subsection, and (3) the excess of the tax computed under section 1 without regard to this section over the tax so computed with reference solely to his personal service taxable income.↩
9. Petitioners argue that A.P. & P.'s existence depended so greatly on David that we should consider it as similar to a professional service corporation, and his salary as similar to the professional's earned income, for which, he argues, there are no limits on "reasonableness." Although we agree that David was the driving force behind A.P. & P., we think that his contributions - time, money, management, inventions - do not transform a corporation engaged in manufacturing with total assets listed on the balance sheet for FYE 1978 in excess of $2,000,000 into a personal services organization. If the facts were as petitioners argued them to be, the case would be a much different one.↩
10. As set forth in our findings, the company's net profit before deducting David's compensation for FYE 1977 was approximately $240,000 and for FYE 1978 was $375,000; David's total compensation for these fiscal years was $188,500 and $235,050.↩
11. Total bumper sales $1,799,861 less "constant" steel bumper sales $1,515,531.↩
12. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
(2) Partially Worthless Debts.--When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
13. Petitioners contend that the description of the debt as being in the approximate amount of $18,929.98 is attributable to the lack of an "exact understanding by the attorney that prepared the documents as to the amount actually owed." We are not convinced. The credible evidence simply does not show that Chrome and A.P. & P. reached an agreement to cut the debt in half even if, as David testified, he offered to settle for 50 percent of it if that amount was paid. We think the documents reflected the situation as it existed when they were signed.↩
14. SEC. 316. DIVIDEND DEFINED. (a) General Rule.--For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders--↩
15. Although we view the corporate minutes with skepticism, we think the "gratuitous" characterization of this payment reflects David's true intention at that time. Indeed, this probably appeared advantageous to him, as it did not impose a legally binding repayment obligation. ↩
16. It seems that David was forced ultimately to foreclose on the mortgage--which did still have value--in order to secure payment of the $27,000 note. ↩
17. Had a true obligation to repay $9,465 existed, it is reasonable that David would have paid the sum out of the $10,000 cash he received. The fact that he later paid $9,465 into A.P. & P. of which for all practical purposes he was sole shareholder, does not necessarily indicate that an obligation to repay existed at the time of release. Benes v. Commissioner,42 T.C. 358, 375-378 (1964), affd. 355 F.2d 929↩ (6th Cir. 1966).